**UNITED STATES of America,
Plaintiff,**

v.

**Harry S. STONEHILL, Robert P. Brooks, Tierra Ranch, Inc., Contracts Discount, Inc., John E. Fort, Julius Baer & Co., Title Insurance and Trust Company, Sam Steinberg, Murray M. Otstott, Herminiz Otstott, and Joe Steinberg, Defendants.**

**No. 65–127.**

United States District Court
S. D. California.

Oct. 16, 1967.

William M. Byrne, Jr., U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Div., Los Angeles, Cal., for plaintiff.

Bertram H. Ross, Los Angeles, Cal., for defendants Stonehill and Brooks.

## ORDER DENYING MOTION
## TO SUPPRESS

WESTOVER, District Judge.

Defendants Harry S. Stonehill and Robert P. Brooks, in quest of fame and fortune after the war, went to the Philippines. So eminently successful were they in ascending the ladder of finance that they brought themselves and their activities to the attention of the Philippine authorities and to the attention of the United States Internal Revenue Service.

In 1960 the tax return of defendant Stonehill for the year 1958 was sent for audit to Mr. Robert Chandler, the United States Internal Revenue Service representative in the Philippines. Because of lack of personnel in his office, Mr. Chandler notified Washington that it was not possible to audit the return and requested assignment of agents to conduct the audit.

Harry S. Stonehill and Robert P. Brooks owned, were officers of, or controlled many companies and corporations. Among the corporations they owned or controlled was United States Tobacco Corporation which allegedly had obtained monopoly of tobacco sales in the Philippine Islands. Menhart Speilman was a trusted employee of the United States Tobacco Corporation but was discharged from his employment by Stonehill and Brooks. His discharge was effected in such manner that Speilman left his employment with a spirit of vengeance and, prior to his departure, had copied and photographed certain documents and records of the United States Tobacco Corporation which he felt disclosed wrongdoing on the part of defendants' corporation.

Mr. Speilman went to Agent Robert Hawley of the United States Federal Bureau of Investigation who was assigned to the American Embassy in Manila; Speilman displayed the copies of records and documents he had obtained from the files of United States Tobacco Corporation and related to Agent Hawley alleged unlawful activities of the corporation and of Stonehill and Brooks.

In evaluating the copies of documents and records together with Mr. Speilman's story so presented to him, Agent Hawley concluded that if the United States Government had any interest in defendants' activities, such interest would arise out of violation of United States tax laws; consequently, Agent Hawley took Mr. Speilman to Robert Chandler of the Internal Revenue Service.

Mr. Chandler looked at the documents and records so presented to him, heard Mr. Speilman's story, and came to the conclusion that the information might be of interest to the Philippine authorities; hence, Mr. Speilman was referred to the Philippine National Bureau of Investigation, and an appointment was arranged for him to be interviewed by Colonel Lukban who was in charge of the Philippine National Bureau of Investigation.

For some time before Colonel Lukban's interview with Mr. Speilman, the Philippine National Bureau of Investigation had been engaged in gathering evidence concerning the activities of Stonehill and Brooks, which evidence was for use in deportation proceedings against them to remove them from the Philippine Islands as undesirable aliens. [Stonehill and Brooks were later deported.]

During the deportation investigation, Colonel Lukban determined that a raid should be made upon premises occupied by Stonehill and Brooks and the various corporations which they owned, controlled, or of which they were officers.[1] Col-

---

1. Corporations so owned, controlled by, or of which Stonehill and/or Brooks were officers are as follows: U.S. Tobacco Corporation, Atlas Cement Corporation, Atlas Development Corporation, Far East Publishing Corporation (Evening News), Investment Inc., Industrial Business Management Corporation, General Agricultural Corporation, American Asiatic Oil Corporation, Investment Management Corporation, Holiday Hills, Inc., Republic Glass Corporation, Industrial

onel Lukban mentioned the contemplated raid to Robert Chandler, and Robert Chandler negated any procedure which included raiding. Nevertheless, the Philippine National Bureau of Investigation consummated raid plans, and meetings were held to determine the modus operandi of conducting the raid. As Colonel Lukban and Robert Chandler were friends, some of the meetings were held in the home of Robert Chandler.

At one of the various meetings of members of the Philippine National Bureau of Investigation (at which Robert Chandler was also present) the premises to be raided were mentioned, and Robert Chandler inquired whether the Army and Navy Building was included on the list of premises; and when informed that the Army and Navy Building was not on the list, he suggested that the building be included. When the raid was conducted the Army and Navy Building was among the premises searched.

Sometime during the investigation of defendants Stonehill and Brooks by the Philippine National Bureau of Investigation a diagram of the premises occupied by the Evening News and the United States Tobacco Corporation was drawn by Robert Chandler [Exhibit J in evidence], together with a memorandum relative to the Goodrich Building [Exhibit I]. The diagram and the memorandum thereafter came into possession of the Philippine National Bureau of Investigation.

To conduct the raid of defendants' premises the Philippine National Bureau of Investigation obtained search warrants, and just prior to the raid a copy of one of the search warrants was shown to Robert Chandler who, upon examining the document, stated that he knew nothing about search warrants but that the copy appeared to be all right.

In the course of the various meetings, Colonel Lukban had promised Robert

Chandler that he, Chandler, would be permitted to examine and copy documents and records which the Philippine National Bureau of Investigation obtained in connection with defendants' activities and the activities of their various corporations.

On March 3, 1962—the day of the raid—Robert Chandler and two agents (sent by Washington to audit the Stonehill return for 1958), at approximately one o'clock in the afternoon, were stationed at or near a small, temporary structure owned by the Philippine National Bureau of Investigation. Mr. Chandler and the two agents waited there until about ten o'clock of that evening, at which time Colonel Lukban contacted them and requested that they come to his office. Chandler and the two agents went to Colonel Lukban's office, saw the documents and records seized by the Philippine National Bureau of Investigation in its raid upon defendants' premises and, when Chandler requested permission to copy or photograph some of the records and documents, his request to copy or photograph them was denied.

Permission to copy or photograph was denied on the ground that no copying or photographing could be done by anyone until after the Philippine National Bureau of Investigation completed an inventory of the items seized by it. On the following day arrangements were made to permit Robert Chandler to copy or photograph the records and documents seized.

Shortly after seizure of the records and documents belonging to the defendants as individuals, or owned by corporations controlled or owned by them, an action was filed in the Manila court by Harry S. Stonehill, Robert P. Brooks, John J. Brooks and Karl Beck, in which action they demanded return of all documents seized by the Philippine National Bureau of Investigation on the ground

and Business Management Corporation, United Housing Corporation, The Philippine Tobacco-Flue-Curing and Redrying

Corporation, Republic Real Estate Corporation, and Merconsel Corporation.

that the items seized were obtained under unlawful search warrants.

The Philippine Constitution, Article III, Section 3 (Bill of Rights) states:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue but upon probable cause, to be determined by the judge after examination under oath or affirmation of the complainant and the witnesses he may produce, and particularly describing the place to be searched, and the persons or things to be seized."

Rule 126, Section 3, of the Rules of Court of the Supreme Court of the Philippines, provides as follows:

"Sec. 3. Requisites for issuing search warrant.—A search warrant shall not issue but upon probable cause in connection with one specific offense to be determined by the judge or justice of the peace after examination under oath or affirmation of the complainant and the witnesses he may produce, and particularly describing the place to be searched and the person or things to be seized.

"No search warrant shall issue for more than one specific offense.

The search warrants used by the Philippine National Bureau of Investigation were the same form (42 warrants) except for description of the premises to be searched and the signatures of the complaining witnesses. The warrants described the offenses of defendants as

"Violation of Central Bank Laws, Tariff and Custom Laws, Internal Revenue Code and Revised Penal Code."

The search warrant affidavits stated, in part:

"This application is founded on confidential information received by the undersigned as peace officer and information which I have personally investigated and found to be as follows:

"The said office has been observed to be the meeting place or accommodation office where various individuals meet in connection with illegal transactions for the purpose of defrauding the government."

The raid hereinbefore discussed was conducted by the Philippine National Bureau of Investigation on March 3, 1962. Thirty-four months later—on January 5, 1965—the United States Government filed with this court the above-entitled action. The complaint alleges that a delegate of the Commissioner of Internal Revenue assessed income tax deficiencies against defendant Harry S. Stonehill for the calendar years 1958 through 1961 in the sum of $13,613,721.51 and against Robert P. Brooks, defendant herein, in the total sum of $11,182,966.73. The complaint also alleges that assessment notices and demand for .payment have been sent to each of the defendants but that they have refused to pay the sums due and owing to the United States Government.

Plaintiff, in its complaint, requests this court to adjudge and decree that the aforementioned tax liabilities are secured by liens on the property of the respective defendants, and that the court make an order that the government is entitled to enforce the tax liens outstanding against the defendants.

Defendants in the action filed a Motion to Suppress the records and documents obtained through the Philippine National Bureau of Investigation in the raid of March 3, 1962. The Motion to Suppress was severed from the other issues of the cause and set for hearing. At the hearing the parties presented evidence as to the legality of the search warrants under which the evidence sought to be suppressed had been seized and evidence as to alleged participation therein by United States agents.

In the course of the hearing of the Motion to Suppress, and while evidence was being adduced, the Supreme Court of the Philippines rendered its decision in the action theretofore filed by Stonehill

and Brooks in Manila—Harry S. Stonehill, et al. -vs- Honorable Jose W. Diokno, etc., et al., C.R. No. L–19550. The Philippine Supreme Court held the search warrants which were the subject of the action to be illegal and void. The Court said:

"Two points must be stressed in connection with this constitutional mandate, namely: (1) that no warrant shall issue but upon probable cause, to be determined by the judge in the manner set forth in said provision; and (2) that the warrant shall *particularly* describe the things to be seized.

"None of these requirements has been complied with in the contested warrants. Indeed, the same were issued upon applications stating that the natural and juridical persons therein named had committed a 'violation of Central Bank Laws, Tariff and Customs Laws, Internal Revenue (Code) and Revised Penal Code.' In other words, no *specific* offense had been alleged in said applications. The averments thereof with respect to the offense committed were *abstract*. As a consequence, it was impossible for the judges who issued the warrants to have found the existence of probable cause, for the same presupposes the introduction of competent proof that the party against whom it is sought has performed *particular* acts, or committed *specific* omissions, violating a given provision of our criminal laws. As a matter of fact, the applications involved in this case do not allege any specific acts performed by herein petitioners. It would be a legal heresy of the highest order, to convict anybody of a 'violation of Central Bank Laws, Tariff and Customs Laws, Internal Revenue (Code) and Revised Penal Code,'—as alleged in the aforementioned applications—without reference to any determinate provision of said laws or codes.

"To uphold the validity of the warrants in question would be to wipe out completely one of the most fundamental rights guaranteed in our Constitution, for it would place the sanctity of the domicile and the privacy of communication and correspondence at the mercy of the whims, caprice or passion of peace officers. * * *."

This Court agrees with the Philippine Court's determination that the search warrants were unlawful and void; hence, the searches and seizures under the warrants were illegal.

In the within Motion to Suppress defendants contend that the raid conducted by the Philippine National Bureau of Investigation was "instigated" by Robert Chandler and other representatives of the United States Government. This contention of instigation is rejected by this Court, as the evidence is clearly to the contrary. The Philippine officials had defendants under investigation for consummation of contemplated deportation proceedings. In addition, Robert Chandler plainly expressed his disapproval of raid procedures to obtain evidence for any purpose.

Defendants further assert that the records and documents in question should be suppressed as evidence because Robert Chandler and other officials of the United States Government "participated" in the raid. The record is unequivocal that neither Robert Chandler nor any other United States Government official or employee participated in, was present at, or a party to the raid conducted by the Philippine National Bureau of Investigation. The evidence discloses that the extent of any "participation" by Robert Chandler was knowledge that a raid was in contemplation of the Philippine authorities. Although he had such knowledge, there is no evidence that Robert Chandler or any United States official or employee took any part in the raid or actually participated therein.

It is plaintiff's assertion that although the search by the Philippine officers has (by the Supreme Court of the Philippines) been determined to be illegal, nevertheless, the United States Government may in this action use the documents and records obtained in that

search, unless an agent of the United States Government so substantially participated in the seizure thereof as to convert the search into a joint venture between United States and Philippine authorities. In support of its contention the plaintiff cites Byars v. United States (1927), 273 U.S. 28, 47 S.Ct. 248, 71 L. Ed. 520 and Lustig v. United States (1949), 338 U.S. 74, 69 S.Ct. 1372, 93 L. Ed. 1819.

■ Neither counsel, in briefing the motion now under consdieration, has mentioned that since 1960 the rule of the "participation" cases seems to be that *no* document or evidence seized in an unlawful search by state officers may be used in a federal court.

In Elkins v. United States, 364 U.S. 206, at page 223, 80 S.Ct. 1437, 1447, 4 L. Ed.2d 1669, the Supreme Court said:

"* * * we hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial. * * *"

The rule of Elkins, supra, has been approved by the Supreme Court in at least two cases since 1960. In Preston v. United States (1964), 376 U.S. 364, at page 366, 84 S.Ct. 881, at page 883, 11 L.Ed.2d 77, the Court said:

"The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers. * * *"

And again, in Wong Sun v. United States (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441, the Supreme Court spoke on the subject as hereinafter discussed.

While the search in Elkins, supra, was made by state officers, the search in the case above-entitled was made by officers of the Philippine government. But there would seem to be little distinction between illegal searches by state officers and illegal searches by foreign officials when, as a result of such search, a United States District Court is required to rule upon the admissibility of the evidence seized.

The United States Court of Appeals for the Ninth Circuit does, however, make a distinction, for in Brulay v. United States of America (decided August 9, 1967), 345 F.2d 383, that Court says:

"The Fourth Amendment is directed at the Federal Government and its agencies. Fourth Amendment rights are protected from state encroachments by the Fourteenth Amendment which reaches the states and their agencies. * * *. Neither the Fourth nor the Fourteenth Amendments are directed at Mexican officials and no prophylactic purpose is served by applying an exclusionary rule here since what we do will not alter the search policies of the sovereign Nation of Mexico."

In Brulay, supra, two Mexican police officers arrested defendant without a warrant and without probable cause, according to United States of America standards. Although the Mexican officers had been alerted as to the defendant by United States Border Patrol agents, the latter did not participate in any manner in defendant's arrest nor in the ensuing search and seizure.

Brulay was convicted of conspiring to smuggle drugs into the United States (18 U.S.C. §§ 371, 545) and appealed his conviction, contending that the fruits of the illegal search by the Mexican officers had been admitted as evidence to convict him in the federal court. Upon the ground hereinabove quoted, the United States Court of Appeals for the Ninth Circuit upheld the admission of the evidence.

Ordinarily the question of search and seizure arises in criminal prosecutions, but this Court sees no reason for not also applying the rule in civil actions. It would seem that in motions like that now

before the Court the only question should, in reality, be: Was the search illegal? If it was, then the fruit of such search should not be used in a federal court, pursuant to language contained in Wong Sun v. United· States, 371 U.S. 471, at page 486, 83 S.Ct. 407, at page 416, in which Mr. Justice Brennan, speaking for the Supreme Court, said:

"*  *  *.  Nor do the policies underlying the exclusionary rule invite any logical distinction [between physical and verbal evidence illegally obtained] *  *  *  [e]ither in terms of deterring lawless conduct by federal officers, *  *  *  or of *closing the doors of the federal courts to any use of evidence unconstitutionally obtained,  *  *  *"* Emphasis supplied.

Under standards of the United States and/or of the Philippines, the records and documents which are the subject of the Motion to Suppress herein were obtained through unlawful search and seizure because of defective search warrants.  But, from the rationale of Brulay, supra, the Ninth Circuit Court of Appeals seems to be of the opinion, for the reason therein so ably expressed, that the rule of Elkins, supra, is inapplicable if the illegal search and seizure is made by foreign government officers.

It may be that the United States Supreme Court will extend the Elkins rule to include any and all evidence illegally obtained, whether seized at home or abroad, when that evidence is presented in a United States Court; but until such extension of the rule is made, this Court is bound by Brulay, supra.

As the Court has hereinabove found there was no instigation nor participation by United States Government officers or employees to exclude the evidence presented; and as the rule of Brulay, supra, permits admission of evidence obtained by foreign officers which, if it had in the same manner been obtained by United States officers, would be excluded as the fruit of unlawful search,

It is ordered that the Motion to Suppress is denied.