**UNITED STATES of America, Plaintiff,**

**v.**

**MODES, INC. and Jaikishan C. Budhrani, Defendants.**

**Court No. 89–04–00206.**

United States Court of International Trade.

March 30, 1992.

131 (1966); *Torrington Co. v. United States,* 14 CIT ——, ——, 745 F.Supp. 718, 723 (1990), *aff'd,* 938 F.2d 1276 (Fed.Cir.1991).

Golden, Potts, Boeckman & Wilson, Claude R. Wilson, Jr., Susan P. Mueller, Dallas, Tex., for defendants.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Patricia L. Petty and Michael Kane, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION

CARMAN, Judge:

This Court has jurisdiction pursuant to 28 U.S.C. § 1582(1) (1988). This is an action to enforce penalties under 19 U.S.C. § 1592 (1988).

Defendants, Modes, Inc. ("Modes") and Jaikishan C. Budhrani, move to suppress all entries, invoices, and other documents contained in the legal files of Defendants' attorney that were seized by the United States Customs Service ("Customs") on May 21, 1985, at the Dallas/Fort Worth International Airport as well as any evidence of the entries set forth by Defendants. Defendants also move to bar Plaintiff from using or referring to such evidence in any way in the trial of the above-captioned matter. This Court finds that Customs' seizure of Defendants' counsel's legal files was unlawful. This Court, however, denies Defendants' motion to suppress because Plaintiff has met its burden of proving that the evidence sought to be suppressed falls squarely within the independent source doctrine because it was either acquired through independent means or required by statutes, regulations, and administrative summonses.

## BACKGROUND

Defendants are in the business of importing jewelry from Taiwan for resale in the United States. In early 1985, Robert Wallace, a Senior Special Agent with Customs began a civil and possible criminal investigation of Defendants. As a result of the Customs investigation, an administrative summons was served on Defendants' attorney Claude R. Wilson, Jr. and Defendant Jaikishan C. Budhrani. Special Agent Wallace sought production, via an administrative summons, of certain records required to be kept by Modes pursuant to 19 U.S.C. § 1508 (1988) to ensure compliance with Customs laws.

Special Agent Wallace postponed the return date on the summons (April 30, 1985) to allow Defendants' counsel, Mr. Wilson, and his investigator, Tim Millis, to travel to Taiwan to question the shipper of the imported merchandise and gather other relevant facts. For unrelated reasons, the trip was delayed.

Both Defendants' counsel and Defendant Budhrani did not comply with the summons claiming protection under the attorney-client privilege and under the Fifth Amendment of the United States Constitution, respectively.

In late May of 1985, after notifying Special Agent Wallace, Mr. Wilson and his investigator travelled to Taiwan to conduct the planned investigation. On May 21, 1985, Mr. Wilson and Mr. Millis returned from Taiwan. While waiting to clear Customs at Dallas/Fort Worth International Airport, the Customs Agent searched Mr. Millis's briefcase that contained Mr. Wilson's legal files on the Modes case. Mr. Millis repeatedly informed the Customs Agent that he worked for Mr. Wilson, an attorney, that the files belonged to Mr. Wilson, and that they concerned an investigation involving Customs. In addition, Mr.

Millis informed the Customs Agent that Special Agent Wallace was working on the case and that he was aware of Mr. Wilson's trip to Taiwan. Mr. Wilson also repeatedly protested the seizure, claiming that the files consisted of documents protected by the attorney-client privilege, the attorney work product doctrine, and the Defendants' rights under the United States Constitution.

Despite the protest, Customs Supervisor Lelon Beckham, Jr. decided to seize the files. Thereafter, he called Special Agent Wallace at home, who according to Supervisor Beckham, requested that the files be turned over to him the next morning. Further, it was Supervisor Beckham's representation to the Defendants that Customs has a right to detain an attorney's legal file.

Special Agent Wallace testified that he consulted several attorneys who advised him that he could not read the documents but could look over the documents in an attempt to find evidence of a violation. Special Agent Wallace stated that he glanced at the documents, did not find any evidence of a violation, put the documents back in the envelopes, and returned the files to Mr. Wilson on May 23, 1985. Mr. Wilson did receive the files on May 23, 1985, but because Mr. Millis had not been allowed to make an inventory prior to the files being taken, he was unable to determine whether any of the documents had been removed.

The following day, May 24, 1985, a Customs Agent visited the shipper in Taiwan. After the visit, the Customs Agent prepared a consumption entry schedule (Def. Exh. C) which Defendants allege to be strikingly similar to Defendants' schedule (Pl. Exh. 3). Also, on that same day, Special Agent Wallace wrote up a referral of the case to the United States Attorney of the Northern District of Texas.

At the time of the airport seizure, Customs was involved in an investigation of the Defendants based upon allegations of double invoicing. On April 29, 1989, the Plaintiff filed a Complaint against the Defendants alleging that the Defendants made false statements on certain invoices of merchandise imported from Taiwan.

In the suppression hearing, Defendants moved to suppress entries, invoices, and other documents which were contained in the legal files of Defendants' attorney and seized by Customs on May 21, 1985, as well as any evidence of the entries set forth on Defendants' consumption entry schedule (Pl. Exh. 3), which was a document contained in the legal files. Defendants allege that as a result of the seizure of Defendants' attorney's files, Plaintiff had access to the attorney's notes, records, and work product regarding Defendants' case which enabled Plaintiff to prepare a consumption entry schedule similar to the consumption entry schedule contained in the seized files. Defendants contend that such evidence must be excluded because it was obtained through an unlawful seizure in violation of the 4th and 14th Amendments to the United States Constitution, the attorney-client privilege, and the attorney work-product doctrine. During the suppression hearing, Defendants abandoned their attorney-client privilege by waiving it upon the testimony of Defendants' counsel.

## DISCUSSION

Before this Court addresses the merits of Defendants' motion to suppress, it must first decide whether the motion is properly before this Court; this action involves a civil proceeding in which the Government is attempting to enforce a penalty action pursuant to 19 U.S.C. § 1592.

### Applicability of Exclusionary Rule

The Supreme Court has held the exclusionary rule applicable in civil proceedings, where the "object, like a criminal proceeding, is to penalize for the commission of an offense against the law." *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). In *Plymouth Sedan*, the state brought a forfeiture proceeding concerning an automobile owned by the defendant under a statute that gave the state a right to title to the vehicle upon proof that the vehicle had been used in the criminal trans-

portation of illegal liquor. The Court determined that the forfeiture was clearly a penalty for the commission of a criminal act by the defendant and held that the exclusionary rule was applicable to forfeiture proceedings such as the one involved. *Id.* at 701–02, 85 S.Ct. at 1251.

*Plymouth Sedan* followed the holding in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), in which the Court found a forfeiture action to be quasi-criminal in nature. *Boyd* was a forfeiture proceeding under the Customs revenue law and the paper held to be within the scope of the Fourth Amendment was an invoice covering the imported goods. 116 U.S. at 617–19, 638, 6 S.Ct. at 525–26, 536. The Court stated in *Boyd:*

> We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal.... [This case] consists of certain acts of fraud committed against the public revenue in relation to imported merchandise.... The information, though technically a civil proceeding, is in substance and effect a criminal one.... As, therefore, suits for penalties and forfeitures incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution....

*Id.* at 633–34, 6 S.Ct. at 534.

In addition to the argument that a penalty action may be deemed quasi-criminal in nature, the Supreme Court "has established that the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.' " *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976) (citations omitted). The *Janis* Court considered the applicability of the exclusionary rule in deciding the issue of whether evidence which included a sum of money and certain wagering records that were seized illegally by a state police officer acting in good faith, was admissible in a civil proceeding brought by the United States. *Id.* at 434, 96 S.Ct. at 3022. After the seizure, the Internal Revenue Service was notified of the evidence and, subsequently, commenced a civil suit for back taxes. The district court ruled that the evidence seized by the state police was inadmissible based upon the exclusionary rule. The Ninth Circuit affirmed. *Id.* at 439, 96 S.Ct. at 3025.

After balancing the benefits to be gained by deterrence of unlawful police conduct against the costs to society of applying the exclusionary rule, the Court concluded that extending the rule to forbid a different sovereign from using the evidence in a civil proceeding was not shown to be outweighed by the societal costs. *Id.* at 454, 96 S.Ct. at 3032. The *Janis* Court, however, did not reach the question of whether or not the exclusionary rule would be applied in a civil proceeding involving an intrasovereign violation. *Id.* at 456–57 n. 34, 96 S.Ct. at 3033 n. 34.

In *Pizzarello v. United States*, 408 F.2d 579 (2d Cir.), *cert. denied*, 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969), the Second Circuit considered the application of the exclusionary rule to an intrasovereign violation. The court addressed the issue of whether evidence, inadmissible in a criminal case, can be used for other purposes by the same agency. The court in *Pizzarello* reiterated the deterrence rationale by reasoning that:

> The prohibitions against unreasonable searches and seizures is directed at governmental action. Absent an exclusionary rule, the Government would be free to undertake unreasonable searches and seizures in all civil cases without the possibility of unfavorable consequences. In such a situation, while the matter has not been settled by Supreme Court decision, it seems clear, even under a view of the law most favorable to the Government, that evidence so obtained would be excluded.

*Id.* at 586.

Once again, in *Tirado v. Commissioner*, 689 F.2d 307 (2d Cir.1982), *cert. denied*, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983), the Second Circuit considered

whether the exclusionary rule applied to an intrasovereign violation, but where, unlike in *Pizzarello*, the constitutional violation was not committed by officers of the agency bringing the civil action. *Id.* at 308. In *Tirado*, the evidence unlawfully seized by federal narcotics agents for use in a narcotics prosecution, was subsequently used in a federal civil tax proceeding. *Id.* at 308–09. The *Tirado* Court concluded "that the deterrence rationale of the exclusionary rule is not served by applying the rule to exclude evidence from a proceeding where the evidence was not seized with the participation or collusion of, or in contemplation of use by, agents responsible for the proceeding in which the evidence [was] presented." *Id.* at 308. Under those circumstances, the Circuit Court held that the rule was not applicable to the case before it. *Id.*

However, the *Tirado* Court approved the use of the exclusionary rule in some civil proceedings, stating: "We therefore agree that the exclusionary rule can be properly and beneficially applied in those civil proceedings where it has a realistic prospect of achieving marginal deterrence." *Id.* at 314.

■ Other federal courts have extended the exclusionary rule's applicability to civil actions prosecuted by the Government. These cases show that the Fourth Amendment exclusionary rule is applicable to civil proceedings brought by the violating sovereign where the objective of those proceedings is to impose what appears to be a penalty. *See Powell v. Zuckert*, 366 F.2d 634, 640 (D.C.Cir.1966) (discharge proceeding against Government employee); *Rogers v. United States*, 97 F.2d 691, 692 (1st Cir.1938) (action to recover Customs duties); *Iowa v. Union Asphalt & Roadoils, Inc.*, 281 F.Supp. 391, 407 (S.D.Iowa 1968), *aff'd. sub nom., Standard Oil Co. v. Iowa*, 408 F.2d 1171 (8th Cir.1969) (civil antitrust action); *United States v. Stonehill*, 274 F.Supp. 420, 425–26 (S.D.Calif.1967), *aff'd*, 405 F.2d 738 (9th Cir.1968), *cert. denied* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969) (tax assessment case); *United States v. Blank*, 261 F.Supp. 180, 182 (N.D.Ohio 1966) (tax assessment case); *Lassoff v. Gray*, 207 F.Supp. 843, 848 (W.D.Ky.1962) (tax assessment case).

■ The Government is seeking to impose penalties against Defendants pursuant to 19 U.S.C. § 1592 for allegedly engaging in a double invoicing scheme. Defendants' Exhibit I reveals that this case was also under possible consideration by the same agency for criminal prosecution. This Court finds that this case, unlike *Janis*, involves an intrasovereign constitutional violation. The seizure was performed by agents of Customs; the very same governmental office that commenced this proceeding. The use of the exclusionary rule in this case should have a great deterrent effect on the future unlawful conduct by Customs Agents who engage in unlawful searches and seizures. This Court further holds that this case falls within the quasi-criminal boundaries set forth in *Boyd* and *One 1958 Plymouth Sedan*.[1]

---

1. At the hearing on the Motion to Suppress, this Court noted that "this proceeding, which seeks a penalty, can easily be thought of, although it is not a criminal proceeding, as 'quasi criminal' in nature." Hearing Transcript at 46 ("Transcript").

 In *United States v. Gordon*, 10 CIT 292, 634 F.Supp. 409 (1986), the United States sought judgment pursuant to 19 U.S.C. §§ 1592 and 1595a (1982), against defendant who allegedly was involved in unlawful introductions and attempts to introduce automobiles into the United States Commerce. Defendant asserted the Fifth Amendment privilege against compulsory self-incrimination in connection with discovery. In a lengthy analysis pertaining to whether § 1592 was "quasi-criminal," the Court concluded using the rationale in *United States v. Ward*, 448 U.S.

242, 100 S.Ct. 2636, 65 L.Ed.2d 742, *reh'g denied*, 448 U.S. 916, 101 S.Ct. 37, 65 L.Ed.2d 1179 (1980), that § 1592 was not "quasi criminal" and, therefore, does not entitle the defendant to Fifth Amendment protections in connection therewith. In *Gordon*, the Court examined the rationale in both *Ward* and *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The *Ward* Court held that a proceeding for the assessment of a civil penalty under § 311(b)(6) of the Federal Water Pollution Control Act was not a criminal case within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination. The *Ward* Court decided that the statute at issue in that case was neither intended to impose a criminal sanction nor "so punitive either in purpose or effect to negate that intention." 448 U.S. at

*Burden of Proof in Suppression Hearing*

Defendants seek to suppress from this penalty case, which this Court has characterized as quasi-criminal in nature, evidence obtained as the result of a wrongful search and seizure conducted by governmental agents upon Defendants' arrival from Taiwan at the Dallas/Fort Worth International Airport.

Specifically, Defendants have requested the Court to suppress Joint Exhibit 1 upon the grounds that these evidentiary items are tainted by an unlawful search and seizure performed by Customs at the airport. None of the challenged items of evidence were physically present in the luggage that was searched. Rather, the Defendants base their motion entirely upon the theory that the challenged items of evidence must be excluded because they relate to con-sumption entries referenced in a chart (prepared by Mr. Millis) that was physically present in the luggage detained by Customs.

▮ In order to prevail with respect to a motion to suppress, the moving party must show (1) that the search and seizure was in fact unlawful, and (2) that the illegality is at least the 'but for' cause of the discovery of the challenged evidence used by the Government at trial. *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599 (1984); *United States v. Crews*, 445 U.S. 463, 470–71, 100 S.Ct. 1244, 1249–50, 63 L.Ed.2d 537 (1980). As to the 'but for' causation issue, the moving party has the initial burden of going forward with specific evidence demonstrating that the trial evidence sought to be suppressed was tainted by the illegal search and seizure. *Alderman v. United States*,

---

248–49, 100 S.Ct. at 2641. *Boyd*, on the other hand, construed a civil forfeiture statute under the Customs revenue laws to be "quasi-criminal" in nature. 116 U.S. at 633–34, 6 S.Ct. at 533–34. The *Boyd* Court found that the action consisted of certain acts of possible fraud committed against the public revenue; therefore, the Court reasoned that even though it was a civil proceeding, the penalty in that action was in substance and effect criminal. *Id.*

The *Gordon* Court relied on the rationale employed by the *Ward* Court in deciding whether the civil penalty under § 1592 could be regarded as "quasi-criminal." The *Gordon* Court looked to the analysis in *Ward* in distinguishing three factors from those found in *Boyd.*

First, the penalty of forfeiture in *Boyd* 'had absolutely no correlation to any damages sustained by society or the cost of enforcing the law,' 448 U.S. at 254, 100 S.Ct. at 2644, whereas the monetary penalty in *Ward* was 'much more analogous to traditional civil damages.' *Id.* Second, as compared to the forfeiture provision in *Boyd*, which was part of the same statutory section as the provision for imprisonment, the civil and criminal remedies in *Ward* were in separate statutes enacted seventy years apart. *Id.* Third, while in *Boyd* there was the danger that the appellant's testimony could prejudice him in future criminal proceedings, the statute in *Ward* specifically barred the use of statutorily mandated disclosures from use in any future criminal actions, other than in actions for perjury of for giving a false statement. *Id.*

*Gordon*, 10 CIT at 295–96, 634 F.Supp. at 414 (*citing Ward*, 448 U.S. at 254, 100 S.Ct. at 2644).

The Court in *Gordon*, while recognizing that "[o]ne might argue that § 1592 should be ana-lyzed in a piecemeal fashion, and that the fraud provisions are "quasi-criminal," while the negligence provisions are not," indicated that "in order to determine Congressional intent, the statute must be viewed as a whole, in as much as Congress enacted the provisions together as part of one scheme for assessing civil penalties in certain circumstances." 10 CIT at 298 n. 11, 634 F.Supp. at 416 n. 11.

This Court notes that in the instant case the Defendant is liable for penalties which sound in fraud, a civil penalty in an amount not to exceed the domestic value of the merchandise (19 U.S.C. § 1592(c)(1)). Defendant should not be required to relinquish his Fourth Amendment rights because he may ultimately be found to have been less culpable or not culpable at all pertaining to possible criminal liability. The fraud penalty is not crafted in this case to recompense society for damages it has sustained; it is designed rather to punish defendant for unlawful conduct. Furthermore as in *Boyd*, there has been danger that Defendants testimony could prejudice him in future criminal proceedings. In fact, evidence at the suppression hearing revealed the contemplation of a criminal proceeding toward Defendants. Moreover, there is no statute such as that used in *Ward* that would bar statutorily mandated disclosure from use in any future criminal actions.

While this Court agrees that statutes must be viewed as a whole to determine Congressional intent, such statutory construction techniques should not be employed to subordinate fundamental Fourth Amendment rights. This Court holds, based upon the authorities set forth in this opinion that § 1592 is "quasi-criminal" and accordingly distinguishes *Gordon*.

394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

In this case, Defendants must first show proof of the illegality of the search and seizure of their attorney's legal files. Defendants must also prove some causal connection between the challenged evidence and the alleged unlawful seizure.

■ Only after the moving party has demonstrated the requisite "taint" by specific evidence, does the burden shift to the Government to demonstrate that its evidence is untainted by proving that one of the exceptions to the exclusionary rule applies (such as independent source, inevitable discovery, good faith, etc). *Alderman*, 394 U.S. at 183, 89 S.Ct. at 972. As the Supreme Court observed,

> '[T]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.'

*Alderman*, 394 U.S. at 183, 89 S.Ct. at 972 (*quoting Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939)).

■ The Government also has the burden of establishing the legality of searches and seizures made by Customs inspectors at port of entry. *United States v. Roussel*, 278 F.Supp. 908, 911 (D.C.Mass.1968). Supreme Court decisions indicate that the appropriate burden of proof at a suppression hearing is no greater than proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974); *Nix v. Williams*, 467 U.S. 431, 444 n. 5, 104 S.Ct. 2501, 2509 n. 5, 81 L.Ed.2d 377 (1984).

Plaintiff maintains that Customs has the right to the type of search and seizure that occurred in this case. For the reasons discussed below, this Court disagrees.

Senior Customs Inspector Katherine Romanac conducted the search of Mr. Millis's briefcase at the airport. Transcript at 279–80. During the suppression hearing she testified that she conducted a routine examination. *Id.* She also stated that she was looking through the attache case for any receipts for undeclared articles, possible currency violations, or money. *Id.* at 281. She also searched for drugs or any type of violation. *Id.* at 282. She admitted that she did not find any type of violation. *Id.* During the course of the investigation, however, Inspector Romanac came across an accounting pad with figures, on which the name Modes was written.

It appears that Mr. Millis and Mr. Wilson informed Inspector Romanac that these files were privileged information and part of Mr. Wilson's legal files. Next, Inspector Romanac called her supervisor, Lelon Beckham, for assistance because Mr. Wilson "was shouting and yelling and telling [her that she] couldn't touch [the file] or look at it." *Id.* at 293. Upon the arrival of Customs Supervisor Beckham, Inspector Romanac testified that Mr. Wilson apprised Supervisor Beckham of the situation and that Special Agent Wallace was working with him on this case. *Id.* at 297–98.

Supervisor Beckham, upon being summonsed by Inspector Romanac, made a decision to seize the documents because they were documents about which he could not make a decision nor did he feel he had the expertise or time to examine the documents. *Id.* at 342. After making the decision to seize the documents, Supervisor Beckham called Special Agent Wallace, who requested that the file be turned over to him the following day.

Inspector Romanac further testified that she had sufficient reasons to have Mr. Millis undergo a second examination because Mr. Millis had declared goods with a value of approximately U.S. $4,000.00; was coming from Taiwan, a source country; and referred to his profession as a consultant. Inspector Romanac testified that her examination of the file before it was sealed revealed no dutiable merchandise or contraband. *Id.* at 305–06. She stated that she had not found any discrepancies in Mr. Millis's customs declaration form and she did not believe that either he or his wife were narcotics carriers.

When questioned as to the reason he decided to seize the documents, Supervisor Beckham responded that "[t]he fact that an individual was bringing in the documents, who was not an employee of Modes," aroused his suspicion. *Id.* at 343. Supervisor Beckham also stated that the "sheer volume of documents; the fact that they needed to be analyzed," and the fact that these documents pertained to the importation of merchandise were reasons for seizing the documents. *Id.* at 344. Another reason Supervisor Beckham decided to seize the documents was because of Mr. Wilson's apparent display of anger and irritation. In fact, Supervisor Beckham testified that Customs has the right to detain the legal files of any lawyer, if a customs officer would like to investigate the files further. *Id.* at 346.

When asked by the Court why he thought that the documents were suspect, Supervisor Beckham responded that when a person carries documents that pertain to a company by which he is not employed, this person becomes suspicious because the documents could be negotiable instruments, bearer bonds, monetary instruments, or even contraband—none of which Supervisor Beckham found in Mr. Millis's files. *Id.* at 366–67.

Supervisor Beckham also stated that he seized the files because he was unable to determine whether they were legally admissible into the United States. On redirect, however, he stated that the type of documents not allowed into the United States are seditious and treasonous documents, *id.* at 369, neither of which Supervisor Beckham found.

The statutes clearly articulate Customs' authority to make searches and seizures of persons at the borders. For example, 19 U.S.C. § 1581(a) (1988) provides authority for customs officials to board any vessel or vehicle and 19 U.S.C. § 1582 (1988) provides that:

> The Secretary of the Treasury may prescribe regulations for the search of persons and baggage ...; and all persons coming into the United States from foreign countries shall be liable to deten-

tion and search by authorized officers or agents of the Government under such regulations.

19 U.S.C. § 1582. In addition, 19 U.S.C. § 482 (1988) contains authority for the search of vehicles and persons when Customs officers suspect merchandise has been illegally introduced into the United States. The section in substance provides that:

> Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial.

19 U.S.C. § 482.

Customs Agents' " 'statutory authority to search is virtually unfettered except perhaps as to due process concerning the manner, not cause of the search.' " *United States v. Cascante–Bernitta,* 711 F.2d 36, 37–38 (5th Cir.), *cert. denied,* 464 U.S. 898, 104 S.Ct. 252, 78 L.Ed.2d 239 (1983).

■ Border searches have long been recognized as an exception to the Fourth Amendment's [probable cause] warrant requirement. *United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *Carroll v. United States,* 267 U.S. 132, 153–59, 45 S.Ct. 280,

**1475**

285–87, 69 L.Ed. 543 (1925). It is not a prerequisite to a border search that the Customs officers have probable cause to believe the persons searched are committing a crime, and mere suspicion alone that contraband property is being brought into the United States is sufficient. *Roussel,* 278 F.Supp. at 911–12. Border searches have been held to be reasonable within the meaning of the Fourth Amendment because of "the single fact that the person or item in question had entered into [the United States] from outside." *Ramsey,* 431 U.S. at 619, 97 S.Ct. at 1980.

A more recent Supreme Court case, *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), addressed the applicable standard in cases involving border searches. The Court held that detention and search beyond the scope of a routine customs inspection may be undertaken based on a "reasonable suspicion" standard justified by a particularized and objective basis for suspecting the particular person of smuggling contraband. *Id.* at 541, 105 S.Ct. at 3310.

■ While it is true that greater leniency is afforded Government officials involved in border searches, Customs officials are nevertheless required to conduct searches and seizures at the borders in a lawful manner. This Court finds that Inspector Romanac's initial investigation was founded upon mere suspicion because Mr. Millis declared an amount exceeding the allowed amount, was a consultant, and was travelling from a source country. These facts prompted suspicion of a reasonable nature for Inspector Romanac to conduct an intensive investigation.

The Court notes, however, that this investigation yielded no evidence of merchandise being imported into the United States which was either subject to duty or contrary to law. It appears to this Court that upon Customs' finding of this fact, the investigation should have ceased. Instead, Mr. Wilson's display of agitation over the seizure of his legal files on Modes, being carried by Mr. Millis, appears to have prompted the need for supervisory intervention which ultimately led to the seizure and sealing of these documents.

■ The facts, however, reveal no sufficient reason provided by Supervisor Beckham to seize the files. Supervisor Beckham was not able to articulate any justifiable and reasonable suspicion that would allow him by law to seize the files. In fact, Supervisor Beckham states that he did not feel he had any expertise whatsoever to properly determine whether or not these files contained any information that would be illegally admissible into the United States. For certain, he knew that these documents were neither seditious nor treasonous. In addition, from a closer inspection he should have been able to ascertain that the documents were not negotiable instruments, bearer bonds, monetary instruments, or contraband. Although he stated that he could not make a determination about the documents, Inspector Romanac, his subordinate, was able to and did make that determination. Certainly her supervisor should have also been able to discern the nature of these documents. Lastly, Supervisor Beckham relies in part on the sheer volume of the documents in arousing suspicion. It appears to this Court based upon an inspection of the exhibits that there was nothing voluminous about these documents which would not allow Supervisor Beckham to adequately conduct an examination.

Because Supervisor Beckham was unable to provide any reasonable criteria from which this Court can find that his suspicions were reasonably aroused, this Court finds that the seizure conducted by Customs was unlawful.

■ The second requirement that the illegality be the "but for" cause of the discovery of the challenged evidence follows ineluctably from the policies underlying and delimiting the exclusionary rule. The "fruit of the poisonous tree" doctrine extends the exclusionary rule beyond evidence directly seized in an unlawful search and seizure to prohibit use of all evidence obtained as an indirect result of such illegal activity. *United States v. Paroutian,* 299 F.2d 486, 489 (2d Cir.1962). Defendants

have the right under the "fruit of the poisonous tree" doctrine to have excluded any offered evidence that is the indirect result of a search and seizure conducted in violation of the Defendants' constitutional rights. *Id.*

 Defendants allege that as a result of the seizure of Defendants' attorney's files, Plaintiff had access to the attorney's notes, records, and work product regarding Defendants' case which enabled Plaintiff to prepare a consumption entry schedule similar to the consumption entry schedule contained in the seized files. Defendants further maintain that the Customs consumption entry schedule (Def.Exh. C), invoices, and documents supporting its entries to be used as evidence against the Defendants of their alleged wrong-doings are clearly "fruit of the poisonous tree." Upon completion of this schedule by Customs, the shipper requested that the Customs Agent allow him to make a copy of the schedule. The shipper then sent a copy of the schedule to Defendants' attorney. Def.Exh. C. As proof for the "but for" causation, Defendants made a comparison of their schedule (Pl.Exh. 3) to the Customs' schedule. Upon Mr. Wilson's request, certified public accountant Seokbun Mickie Ha prepared a computer-generated comparison of the two schedules. Def.Exh. K. Ms. Ha's comparison reveals the similarities between the two schedules. In fact, any differences are attributed to the fact that Defendants' schedule covers a broader time period.

With Defendants having met their burden of putting forth evidence of an unlawful seizure and a nexus between the files seized and the challenged evidence, the burden shifts to the Government. The Government contends that the evidence sought to be suppressed by the Defendants should be allowed as evidence because Customs could have obtained the information contained in Defendants' attorney's legal files from an independent source. For the reasons that follow, this Court finds that the Government has successfully met its burden of demonstrating that its evidence is untainted by relying on the independent source exception.

The Supreme Court decisions of *Nix,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 and *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), narrowed the scope of the exclusionary rule as set forth in *Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046, by carving a discovery exception into the exclusionary rule. In *Nix,* 467 U.S. at 445, 447, 104 S.Ct. at 2509, 2510, the Supreme Court adopted the inevitable discovery exception to the "fruit of the poisonous tree" doctrine. The Court explained that the interest of society in deterring unlawful Government conduct and the public interest in having juries receive all probative evidence is properly balanced "by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place." *Id.* at 447, 104 S.Ct. at 2511. By contrast, the exclusion of evidence that would inevitably have been discovered would "operate to undermine the adversary system," and would strike an impermissible balance "by putting the State in a *worse* position than it would have occupied without any police misconduct." *Id.* (emphasis in original).

Likewise, in *Murray,* 487 U.S. at 541, 108 S.Ct. at 2535, the Court allowed the independent source exception to the exclusionary rule stating that invoking the exclusionary rule would put the police not in the same position they would have occupied if no violation had occurred, but in a worse position. *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

First, Plaintiff's ability to obtain the documents through an independent source is demonstrated through Customs' actions on the day immediately following the return of Defendants' attorney's files. On that day, a Customs Agent in Hong Kong visited the shipper. The shipper refused to give the invoices in question to the Customs Agent, but allowed the Customs Agent to review the invoices in his presence. While at the shipper's place of business, the Customs Agent reviewed the invoices and prepared a schedule of entries and invoices pertaining to the shipments

made to Defendant Modes, Inc. which was almost identical to the schedule of entries and invoices found in Defendants' attorney's legal files.

Ronald Kresock, the Customs Agent who interviewed the Taiwanese shipper, testified that he called the Taiwanese shipper during business hours on May 21, 1985, to schedule a date for his interview. Transcript at 462–63; see Pl.Exh. 2. Because of the time difference between Hong Kong/Taiwan and Dallas, i.e., thirteen hours, it appears questionable that Mr. Kresock's telephone call could have resulted from the events at the airport that occurred later that day. Mr. Kresock also testified that he made a chart summarizing all of the invoices from the shipper to Defendants, as well as the records of payments from Defendants to the shipper. Mr. Kresock transmitted the chart to Dallas. In contrast to the chart prepared Mr. Wilson, Mr. Kresock's chart did not contain customs entry numbers.

This Court finds that during the suppression hearing, Mr. Kresock testified that he prepared a schedule of entries based upon access to the Shipper's files. Indeed, he was provided the same access to these files as Mr. Millis, Defendants' investigator, had been when he was preparing the consumption entry schedule. At the suppression hearing, Mr. Millis testified that he had organized the files when making his report. Thus, it is not surprising that when shortly thereafter the Customs officer visited the Taiwanese Shipper's office to prepare his report, that his report would have a "strikingly similar" resemblance to that found in Mr. Millis's briefcase; particularly, in light of the fact that Customs was preparing the schedule from the same files. Indeed, it appears that Defendants' counsel assisted Customs.

In addition, Mr. Millis also testified that he had organized the checks in chronologi-

cal order. Presumably, this remained the same order in which Customs Agent Mr. Kresock found the files and recorded his data a week later. The alleged similarity between the chart prepared by Mr. Kresock and the chart prepared for Defendant by Mr. Millis proves absolutely nothing: both men would be expected to prepare charts incorporating the same information, i.e., information relating to all transactions between the shipper and the Defendants. Indeed, it would be surprising if the two charts were not similar.

While this Court recognizes that much of the same material appearing on Defendants' Analysis of Plaintiff's Exhibits (Def.Exh. K) is the same as the challenged evidence from the entries and invoice numbers shown on the schedule in Defendants' attorney's legal files, this Court finds, for the reasons stated above, that the Government has established that it prepared the consumption entry schedule through an independent source. Accordingly, there is no "but for" causation linking the interview with the shipper, or any of the evidence that flowed from that interview, with the unlawful seizure.

Second, Plaintiff contends that most of the items in Joint Exhibit 1 are subject to statutes and regulations requiring that they be submitted to Customs as the corresponding merchandise enters the United States.[2] The merchandise at issue in this case could not be released from Customs absent the filing of a consumption entry containing a commercial (or pro forma) invoice and a packing list. 19 C.F.R. §§ 142.3(a)(1), (3), and (4) (1989); see 19 U.S.C. §§ 1481, 1482, 1484, and 1485. Also prior to release, the Defendants were required to file air waybills, uniform airbills, and bills of lading. 19 C.F.R. §§ 141.11(a)(1), 142.3(a)(2); see 19 U.S.C. § 1484(c). Because the unlawful seizure occurred in May 1985 and because the challenged items

---

**2.** See 19 U.S.C. §§ 1481, 1482, 1484, 1485 (1988); 19 C.F.R. §§ 10.172, 10.173(a), 141.11(a)(1), 142.3(a) (1989), which require the filing of all invoices, special Customs invoices, original consumption entries, certificates of origin, packing lists, air waybills, uniform airbills, pro forma invoices, and bills of lading.

See also Plaintiff's Supplemental Brief on the Issue of Causation in Opposition to Defendants' Motion to Suppress at 4–5 ("Plaintiff's Supplemental Brief") (linking Plaintiff's Exhibits 1–74(c) (Joint Exh. 1) to either statutes or regulations that require Defendants to submit documentation to Customs as a matter of law).

of evidence all relate to transactions that occurred during the preceding year—the vast majority of the challenged evidence should have been submitted to Customs well in advance of the time that the seizure occurred.

In addition, the Government had already requested much of the information through administrative summonses. *See* Pl.Exhs. B, E, F, & G. Each and every one of the challenged items of evidence was also delivered in response to an administrative summons that was outstanding at the time of Customs' alleged impropriety.[3] Initially, Defendants did not comply with the administrative summonses until compelled to by the determination of the United States Court of Appeals for the Fifth Circuit in *United States v. Wilson*, 864 F.2d 1219, 1223 (5th Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989). The United States Court of Appeals for the Fifth Circuit held that the administrative summonses requesting the challenged evidence were untainted. The court stated that

> At the time of the search and seizure, there were two outstanding subpoenas that apparently covered the seized documents. New subpoenas, which also covered these papers and were identical except for the shorter time period covered, were issued shortly after the seizure. Hence, Modes cannot establish that the 'subpoenas are the result of the ... allegedly improper access....' *ESM, id.,* at 318. The description of the documents was fashioned prior to the incident at the airport, as was Customs's effort to obtain the documents. Under these circumstances, and irrespective of how distasteful the events at the airport may have been, Modes cannot establish an abuse-of-process defense under ESM.

*Wilson*, 864 F.2d at 1223.

On its face, the summons requested the production of the following records for the period from 1983 to 1985.

(1) accounts payable ledgers, purchase orders, invoices and shipping documents pertaining in whole or in part to the importation of merchandise into the United States;

(2) cancelled checks, monthly bank statements, deposit slips and credit/debit memos from all foreign and domestic bank accounts pertaining in whole or in part to the importation of merchandise into the United States;

(3) correspondence or memoranda relating to damage claims by Modes, Inc. against foreign suppliers or carriers of merchandise imported into the United States or their insurance companies;

(4) correspondence, memoranda or telexes between Modes, Inc. and foreign suppliers in any way pertaining to the importation of merchandise into the United States; and

(5) all business agreements between Modes, Inc. and foreign suppliers in any way pertaining to the importation of merchandise into the United States.

Pl.Exhs. B, E, F, and G.

Plainly, each and every one of the challenged documents is within the scope of this request and is a document that Defendants agreed to maintain on file for Customs. *See* 19 U.S.C. § 1508; 19 C.F.R. § 111.21 *et seq.* The Government should be placed in the same position that it would have occupied had the alleged misconduct not occurred. *Nix*, 467 U.S. at 447, 104 S.Ct. at 2510.

In sum, the Defendants have presented absolutely no evidence to rebut the Government's arguments upon the issue of causation. The fact that the Government did not have this information prior to the seizure, in no way proves that the Government would not have been able to access this information independently.

This Court finds that Plaintiff was able to determine the invoices on which to base its allegations without the schedule of en-

---

**3.** See Plaintiff's Supplemental Brief at 5 for documents which were requested by a summons predating the search and which Defendants were required to keep on file and submit to Customs at Customs' request. *See also* 19 U.S.C.

§ 1508 (requiring importers to "make, keep, and render for examination and inspection" any records that pertain to the importation of merchandise or "are normally kept in the ordinary course of business"); 19 C.F.R. § 111.21 *et seq.*

tries and invoices found in Mr. Wilson's files through independent sources, namely, Customs Agent Kresock's own findings, information required through the statute, and information mandated through Customs' administrative summonses. Accordingly, Defendants' motion to suppress must fail.

## CONCLUSION

In the summons enforcement case involving the same facts upon which Defendants' Motion to Suppress is based, the Fifth Circuit Court of Appeals reprimanded Customs regarding the airport seizure of Mr. Wilson's legal files as follows:

> [W]e think it appropriate ... to admonish Customs for what can only be described as outrageous and reprehensible behavior on the occasion in question.

*Wilson*, 864 F.2d at 1223. This Court agrees with the Fifth Circuit's finding that Customs' seizure of the legal files of Defendants' attorney was an outrageous and reprehensible act and delivers an admonishment to Customs of equal force as that of the Fifth Circuit.

While it is true that the facts presented by the Defendants seem to suggest a calculated seizure on the part of Customs, this Court finds that the facts of this case and the testimony of the witnesses at the suppression hearing revealed an independent investigation. It appears, nevertheless, that the incident at the airport may have occurred because of preordained plans of overzealous Customs officials.

The Defendants ardently, albeit unsuccessfully, attempt to prove the nexus between the seized files and the Government's evidence. This Court finds that the Government has met its burden of proving that much of the evidence sought to be suppressed falls squarely within the independent source doctrine because it was either acquired by Customs through independent means or required by statutes, regulations, and administrative summonses.

Accordingly, Defendants' motion to suppress is denied.