KIVELA v DEPARTMENT OF TREASURY

Docket No. 97196. Argued March ·7, 1995 (Calendar No. 12). Decided July 18, 1995.

Diane Kivela petitioned the Tax Tribunal, challenging a jeopardy tax assessment by the Treasury Department for unpaid taxes on drug sales, arguing that the department could not use evidence seized during an illegal search in a criminal case as the basis for a civil tax case. The Tax Tribunal granted summary disposition for the department, holding that the evidence was admissible. The Court of Appeals, MURPHY, P.J., and WAHLS, J. (MICHAEL J. KELLY, J., concurring in the result only), reversed, stating that the Tax Tribunal is not permitted to base a jeopardy tax assessment on unlawfully seized evidence, and that an unlawful search and seizure may not serve as the triggering event for a tax assessment (Docket No. 138738). The department appeals.

In an opinion by Justice MALLETT, joined by Chief Justice BRICKLEY, and Justices BOYLE, RILEY, and WEAVER, the Supreme Court *held:*

In the intrasovereign context and in the absence of collusion, evidence unlawfully seized in a criminal case properly may be admitted for purposes of an independent civil tax assessment proceeding.

1. The Michigan Constitution does not provide a greater degree of protection than the United States Constitution unless there is a compelling reason to impose a different interpretation. Case law has held that the mere fact that narcotics are involved in a crime is not sufficiently compelling to create a broader standard for exclusion per se than that provided by the Fourth Amendment. The scope of the Michigan exclusionary rule depends on the facts of each case. Claims that Const 1963, art 1, § 11 should be interpreted more expansively than the Fourth Amendment must rest on more than a disagreement with the United States Supreme Court.

2. Comparison of the Michigan and federal constitutions clearly indicates no intention to impose more stringent restrictions on law enforcement under art 1, § 11 than is mandated by the Fourth Amendment. Nor is there a compelling reason to hold that the Michigan Constitution provides a greater suppres-

sion remedy. In this case, because there is no evidence of bad faith, collusion between agencies, or unethical behavior on the part of the law enforcement agents, allowing the incriminating financial records to be admitted in the civil tax proceeding will not affect the deterrence of the exclusionary rule or allow an increase in the use of criminal cases as a mere pretext for civil cases.

Reversed.

Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that under the prevailing federal authority, the Fourth Amendment exclusionary rule precludes use of the illegally seized evidence in this jeopardy tax proceeding because of the quasi-criminal nature of the tax fraud penalties and the jeopardy assessment proceedings, the factual connection between the police officers who illegally obtained the underlying evidence and the subsequent tax proceedings, and the minimal cost to society of excluding the evidence in the jeopardy proceeding.

The incremental deterrent effect of applying the exclusionary rule in a civil proceeding must be balanced against the substantial cost to society's interest in using relevant evidence. The primary focus should be on the nature of the subsequent proceeding. A court also may consider whether the proposed use of evidence is intersovereign or intrasovereign, and whether the same agency was involved in both the search and the subsequent proceedings or, if not, whether there was any indication of an explicit and demonstrable understanding between the agencies. The closer the relationship involved, the greater is the inference to be drawn that the officer had the subsequent proceeding in mind at the time of the seizure.

In this case, the criminal proceedings were dismissed because the evidence underlying the charges was unconstitutionally obtained under a warrant that lacked probable cause. The primary deterrent effect has been achieved. The fraud penalty and jeopardy aspects of this proceeding characterize it as quasi-criminal. The jeopardy assessment is best characterized as an additional penalty imposed to punish criminal-like activity and is aimed only at individuals who are violating the law by intending to evade tax collection. It is imposed nearly exclusively when criminal activity is the basis of the assessment.

It is the quasi-criminal nature of the tax penalties at issue that require application of the exclusionary rule. Because the agencies involved are statutorily derived from the Michigan Constitution, the proposed use is intrasovereign, which weighs in favor of applying the exclusionary rule. Had this case been instituted after the executive order transferring the Tax Fraud

Division to the Department of State Police became effective, the exclusionary rule irrefutably would preclude use of the evidence. Further, the facts in this case reveal a troubling nexus between the officers who seized the evidence and the tax fraud/ state police detective who initiated the tax proceedings, weighing in favor of applying the exclusionary rule.

200 Mich App 545; 505 NW2d 11 (1993) reversed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *E. David Brockman* and *Daniel M. Levy,* Assistant Attorneys General, for the respondent-appellant.

MALLETT, J. We granted leave in this case to determine whether evidence seized in an improper police search may be used in a separate and independent civil jeopardy tax assessment proceeding. More specifically, we are asked to determine whether financial records detailing sales and purchases of narcotics that were seized during a criminal investigation pursuant to an invalid search warrant are admissible for purposes of a civil tax assessment proceeding.

The Tax Tribunal held that the improperly seized records were admissible; however, the Court of Appeals reversed in favor of petitioner Diane Kivela. We reverse the Court of Appeals determination and find in favor of respondent Department of Treasury. In the intrasovereign context, we hold that in the absence of collusion, unlawfully seized evidence may properly be admitted for purposes of an independent civil tax assessment proceeding.

I

On July 7, 1989, police officers searched the home of petitioner Diane Kivela pursuant to a search warrant. The search warrant was issued on the basis of information provided by an informant who indicated that Ms. Kivela had been selling

drugs since July, 1988. As a result of the search, the police officers seized four ounces of marijuana and several financial records documenting the sales and purchases of narcotics.

Kivela was charged with possession of marijuana with intent to deliver.[1] However, the charge was dismissed when the judge held that the search warrant was invalid because it was not supported by probable cause.

In the meantime, however, Kivela's financial records were turned over to the Department of Treasury. On the basis of the illegally seized financial records, the department determined that Kivela owed unpaid sales, use, personal income, and single business taxes, together with penalties and interest. The department issued a jeopardy tax assessment of $26,079 for unpaid taxes on drug sales between July, 1988, and July, 1989, pursuant to MCL 205.26; MSA 7.657(26).[2]

Kivela filed a petition with the Tax Tribunal in which she argued that the Department of Treas-

[1] MCL 333.7401(2)(c); MSA 14.15(7401)(2)(c).

[2] MCL 205.26; MSA 7.657(26) provides:

> If the commissioner . . . finds that a person liable for a tax administered under this act intends quickly to depart from the state or to remove property from this state, to conceal the person or the person's property in this state, or to do any other act tending to render wholly or partly ineffectual proceedings to collect the tax unless proceedings are brought without delay, the commissioner . . . shall give notice of the findings to the person, together with a demand for an immediate return and immediate payment of the tax. A warrant . . . may issue immediately upon issuance of a jeopardy assessment. Thereupon, the tax shall become immediately due and payable. If the person is not in default in making a return or paying a tax prescribed by this act, and furnishes evidence satisfactory to the commissioner . . . under rules promulgated by the department that the return will be filed and the tax to which the commissioner's . . . finding relates will be paid, then the tax shall not be payable before the time otherwise fixed for payment.

ury could not use evidence seized during an illegal search as the basis for a civil tax case. Both Kivela and the Department of Treasury moved for summary disposition pursuant to MCR 2.116(C)(10). The Tax Tribunal granted the department's motion for summary disposition, denied Kivela's motion, and held that the evidence was admissible.

The Court of Appeals reversed,[3] stating that "the Tax Tribunal is not permitted to base its jeopardy tax assessment upon unlawfully seized evidence, nor may the unlawful search and seizure serve as the triggering event for the tax assessment." 200 Mich App 545, 552; 505 NW2d 11 (1993). The Court of Appeals noted:

> The Michigan Constitution is construed to provide no greater protection against unreasonable searches and seizures than does the Fourth Amendment, absent a compelling reason to apply a different interpretation. Const 1963, art 1, § 11; *People v Collins,* 438 Mich 8, 11, 25-31; 475 NW2d 684 (1991); *People v Cooke,* 194 Mich App 534, 537; 487 NW2d 497 (1992). It does not necessarily follow, however, that Michigan's exclusionary rule must be applied in the same manner as the federal exclusionary rule, nor is Michigan required to follow the interpretation offered by the Second Circuit Court of Appeals. Our Supreme Court has acknowledged that Michigan's exclusionary rule differs from and provides greater protection than that established by the United States Supreme Court. *In re Jenkins,* 437 Mich 15, 28; 465 NW2d 317 (1991). [*Id.* at 550.]

This Court granted the Attorney General's application for leave to appeal. 447 Mich 987 (1994).

II

It is undisputed that under federal authority,

[3] MURPHY, P.J., and WAHLS, J., formed a majority, while Judge MICHAEL J. KELLY concurred in the result only.

the financial records documenting the sales and purchases of narcotics seized from a defendant by one sovereign pursuant to an invalid search warrant, may be used as evidence in a civil tax assessment proceeding by another sovereign. *United States v Janis,* 428 US 433; 96 S Ct 3021; 49 L Ed 2d 1046 (1976).

In *Janis,* the United States Supreme Court held that evidence seized by state police officers pursuant to an invalid search warrant may be used in a civil suit brought by the Internal Revenue Service to determine the suspect's tax liability. A Los Angeles police officer obtained a search warrant from a state court judge and seized $4,940 in cash and incriminating wagering records. The officer notified the IRS that Mr. Janis had been arrested for bookmaking activities, and the IRS levied upon the cash.

Although Mr. Janis was able to convince a state judge to quash the warrant in a state criminal proceeding, the United States Supreme Court held that "the judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign." *Id.* at 459-460. The Court reasoned that the deterrent effect of the exclusionary rule does not outweigh the societal cost that would result from the exclusion of incriminating evidence.

The United States Court of Appeals for the Second Circuit extended the rule of *Janis* to intrasovereign situations, and held that unconstitutionally seized evidence collected by federal agents could still be used by the IRS to determine the suspect's tax liability for narcotics-related income in a federal civil tax proceeding. *Tirado v Comm'r of Internal Revenue,* 689 F2d 307 (CA 2, 1982), cert den 460 US 1014 (1983). Similar to the reasoning

in *Janis,* the *Tirado* court concluded that the
deterrence rationale of the exclusionary rule was
not furthered by excluding evidence that was
seized without the contemplation of use in a subse-
quent civil tax proceeding. Thus, according to the
Second Circuit Court of Appeals, the key inquiry
in such cases is whether the unconstitutional
search and seizure was motivated by the use of the
evidence in the proceeding in which it is pre-
sented. The court stated:

> Tax deficiency proceedings are too remote from
> the "zone of primary interest" of the narcotics
> agents who made the seizures in Tirado's apart-
> ment. As in *Janis,* it is not reasonable to suppose
> that a rule barring use of the evidence in a civil
> tax proceeding would have materially influenced
> those agents in their decision whether to make the
> particular seizures. . . . Nor would agents of the
> Drug Enforcement Agency be likely to harbor a
> general motivating interest in assisting the en-
> forcement of civil tax obligations. [*Id.* at 314.]

Therefore, *Tirado* does not prohibit the use of
the federal exclusionary rule in all civil cases, but
instead calls for an analysis of the facts of each
case. Unless there is collusion between the agency
that performed the illegal search and the agency
seeking to admit the incriminating evidence, the
evidence is admissible. See also *Wolf v Comm'r of
Internal Revenue,* 13 F3d 189 (CA 6, 1993),[4] and

---

[4] *Wolf* involved whether the exclusionary rule bars the admission of
illegally seized evidence during a criminal narcotics investigation in a
civil tax proceeding. In holding that the exclusionary rule does not
apply to facts, the Sixth Circuit Court of Appeals commented as
follows:

> The Supreme Court has required that the deterrence effect
> must be balanced against the "substantial cost on societal
> interest in law enforcement by its proscription of what conced-
> edly is relevant evidence." . . . Accordingly, to determine

*Adamson v Comm'r of Internal Revenue,* 745 F2d 541 (CA 9, 1984).[5]

The United States Court of Appeals for the Sixth Circuit has taken a different approach than that found in *Tirado,* although reaching the same result as the Court of Appeals for the Second Circuit in *Tirado.*[6] In *Wolf,* federal and local law enforcement officers searched the residence of Michael Wolf on two occasions and "seized 400.2

whether the exclusionary rule applies in any particular context, a court must determine whether application of the rule is deemed substantially likely to deter future violations of the Fourth Amendment. [*Id.* at 193, citing *Janis* at 453-454; *Stone v Powell,* 428 US 465, 484; 96 S Ct 3037; 49 L Ed 2d 1067 (1976); *Tirado* at 310.]

[5] *Adamson,* like *Wolf,* dealt with whether the exclusionary rule bars the Internal Revenue Service from using illegally obtained evidence in a civil tax proceeding. The Ninth Circuit Court of Appeals held that because the evidence was not obtained in bad faith, the evidence was admissible for purposes of a jeopardy tax assessment against Adamson. The court stated:

"[W]e do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." [*Adamson, supra* at 545.]

[6] The dissent in the instant case states that "*Wolf* rejected *Tirado's* approach that focused predominately on the 'primary zone of interest' of the officer who had conducted the search." CAVANAGH, J., *post* at 243-244 (citations omitted). We wholly disagree with such a statement. The *Wolf* court merely stated that "[t]o rely *primarily* on the existence of a correlation between an officer's expertise and authority and the subsequent proceedings, if taken to its logical conclusion, would produce bizarre results." *Wolf, supra* at 194 (emphasis added). This statement by the *Wolf* court does not demonstrate a "rejection" of the *Tirado* approach, as represented by the dissent. Instead, it expresses the desire to expand the inquiry to include other important factors and to not "rely *primarily* on the existence of a correlation between the officer's expertise and authority and the nature of the subsequent proceedings." *Id.* (emphasis added).

Furthermore, the dissent cleverly fails to recognize that the *Wolf* court reached the same conclusion as the *Tirado* court, despite the introduction of the *Wolf* balancing test. Thus, unlike the dissent, we do not view the *Wolf* analysis as a complete rejection of *Tirado,* since there simply is no support for such a contention. Rather, we rationally view *Wolf* as an extension and clarification of *Tirado.*

grams of cocaine, 201 pounds of marijuana, and $143,286 in cash." *Id.* at 192.

Approximately four years after Wolf pleaded guilty to one count of possession with intent to distribute approximately twelve ounces of cocaine, the IRS issued a notice of deficiency to Wolf when it recalculated his taxable income to include the seized cash, cocaine, and marijuana. The IRS also asserted that Wolf negligently failed to report taxable income and wrongly filed a substantial understatement of tax. *Id.* at 191.

The Tax Court admitted the evidence of the cocaine, marijuana, and cash, and found that Wolf's taxes were deficient and imposed additions to the tax.[7] Mr. Wolf appealed, and the Court of Appeals for the Sixth Circuit affirmed.

In holding that the Fourth Amendment did not bar the admission of the illegally seized evidence, the court formulated a five-pronged balancing test to determine whether to apply the exclusionary rule to civil tax proceedings. The court considered the following factors:

1. The nature of the proceeding;
2. Whether the proposed use of unconstitutionally seized material is intersovereign or intrasovereign;
3. Whether the search and the second proceeding are initiated by the same agency;
4. Absent an explicit and demonstrable understanding between the two agencies, whether there is statutory regime in which both agencies share resources, particularly resources derived from one of the proceedings; and

---

[7] The Tax Court, for purposes of the tax proceeding, assumed that Wolf's Fourth Amendment rights were violated. *Id.* at 192, n 1.

5. The relationship between the law enforcement responsibilities and expertise of the seizing officials and the type of proceeding at which the seized material is being offered.

Upon reaching the decision that the exclusionary rule does not bar the admission of illegally seized evidence during a criminal narcotics investigation in a civil tax proceeding, the court stated:

> In this case, the use of the seized cash and drugs as evidence in subsequent civil tax proceedings cannot be said to have been within the zone of primary interest of Agent Brawner. The secondary tax proceedings were civil in nature. They were not intended to punish Wolf for his narcotics violations. Rather, the civil tax proceedings were designed to subject Wolf to the same tax requirements to which all citizens are subject, whether their income derives from legitimate or illegitimate sources. Also, there is no indication that the criminal narcotics investigation and the secondary civil tax proceeding were initiated by the same agency. Further, there was no indication of an explicit agreement between Agent Brawner and agents of the IRS. . . . The only factor suggesting a relationship between the purposes of the allegedly unconstitutional search and the secondary civil tax proceedings is the fact that both were initiated by the same sovereign. This factor alone, however, is insufficient to suggest that there exists a close relationship between the purposes of the search and the secondary proceedings. In the absence of such a relationship, it is unlikely that application of the exclusionary rule would further deter future violations. We hold, therefore, that the exclusionary rule does not apply in this case. [*Id.* at 195-196.]

Thus, regardless of the methodology used, both

federal circuits in *Tirado* and *Wolf* have rejected the application of the exclusionary rule in civil tax proceedings.

### III

Defendant does not dispute the fact that federal authority does not bar the use of unconstitutionally seized evidence in civil tax proceedings. The defendant continues to contend that the Michigan Constitution[8] provides a greater protection than the Fourth Amendment of the United States Constitution.[9] The Michigan rule on this issue was established in *People v Nash,* 418 Mich 196; 341 NW2d 439 (1983). See also *Collins, supra* at 25-29,[10] and *Cooke, supra* at 537.

In *Nash, supra* at 207-215, 225-226, this Court held that the Michigan Constitution does not pro-

---

[8] The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state. [Const 1963, art 1, § 11.]

[9] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [US Const, Am IV.]

[10] *People v Collins,* dealt with whether recorded evidence of a conversation between Collins and a police informant without a valid search warrant was admissible in a criminal trial. This Court noted that it is now well settled that participant monitoring such as was the situation in this case does not violate the Fourth Amendment of the United States Constitution. Thus, on finding that there were no "compelling reasons" to interpret art 1, § 11 of the Michigan Constitution any differently than the Fourth Amendment, this Court held that the evidence was admissible.

vide a greater degree of protection than the
United States Constitution unless there is a "com-
pelling reason" to impose a different interpreta-
tion. Mr. Carron L. Nash was convicted by a jury
of second-degree murder. However, the Court of
Appeals reversed and remanded the case to the
trial court, finding that evidence of the victim's
body should have been suppressed because it was
discovered as a result of an illegal search. This
Court reversed, holding that the evidence of the
body was admissible. This Court reasoned that art
1, § 11 of the Michigan Constitution does not pro-
vide any greater protection than the Fourth
Amendment of the federal constitution. Further-
more, there was no "compelling reason" to do so.
See, e.g., *People v Beavers,* 393 Mich 554; 227
NW2d 511 (1975). The Court stated that the mere
fact that weapons and narcotics were involved in
the crime was not compelling enough to create a
higher standard per se. *Nash, supra* at 215. Thus,
like the holding in *Tirado, supra,* the scope of the
Michigan exclusionary rule depends on the facts of
each case. See also *People v Faucett,* 442 Mich
153, 158; 499 NW2d 764 (1993), and *Collins, supra*
at 27-29.

This rule was further clarified in *Sitz v Dep't of
State Police,* 443 Mich 744, 749-763; 506 NW2d 209
(1993). The issue was whether sobriety checkpoint
roadblocks, at which motor vehicles are stopped
despite the lack of probable cause or suspicion that
the driver might be intoxicated, violate art 1, § 11
of the Michigan Constitution. In finding that so-
briety checkpoints violate our state constitution,
the Court stated that, "claims that art 1, § 11
should be interpreted more expansively than the
Fourth Amendment must rest on more than a
disagreement with the United States Supreme
Court." *Id.* at 752-753.

Although *Sitz* found that Const 1963, art 1, § 11, provided greater protection than is found in the Fourth Amendment, the Court also stated that "[p]roperly understood, the *Nash* rule compels neither the acceptance of federal interpretation nor its rejection. In each instance, what is required of this Court is a searching examination to discover what law 'the people have made.' *People v Harding,* 53 Mich 481, 485; 19 NW 155 (1884)." The *Sitz* Court further stated:

> Today we clarify that the compelling reason test must be interpreted in the context of our observation that the [antiexclusionary-rule] proviso [of Const 1963, art 1, § 11] should not be read as "an interdiction" of the first two clauses, under which this Court "created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor." *Nash, supra* at 214. Thus, "compelling reason" should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law. As illustrated by the question presented today, a literal application of the term would force us to ignore the jurisprudential history of this Court in favor of the analysis of the United States Supreme Court announced in *Sitz.*
>
> *        *        *
>
> The judiciary of this state is not free to simply engraft onto art 1, § 11 more "enlightened" rights than the framers intended. By the same token, we may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection. [*Id.* at 758-759.]

IV

On the basis of the foregoing, the Court of

Appeals correctly stated that the "Michigan Constitution is construed to provide no greater protection against unreasonable searches and seizures than does the Fourth Amendment, absent a compelling reason to apply a different interpretation." 200 Mich App 550, citing *Collins, supra* at 11 and 25, and *Cooke, supra* at 537. However, the Court of Appeals incorrectly found that the failure to apply the exclusionary rule would frustrate the deterrent purpose of the rule. We can find no compelling reason to interpret the federal and state constitutions differently. To read the exclusionary rule as providing a greater protection than that established by the federal constitution would serve to render this Court's pronouncement in *Nash, Collins,* and *Sitz* a nullity.

We find little or no support for the conclusion that Michigan law provides a broader suppression remedy. First, in *Collins, supra* at 31, this Court stated that "[a]lthough a number of appellate decisions have referred to the compelling reason standard, little in the way of guidance has been provided concerning its contours and meaning." The Court suggested, however, that the analysis start with a comparison of the text of the state and federal constitution. When comparing the texts at issue, this Court concluded that "the historical record clearly indicates that the people of Michigan had no intention of imposing more stringent restrictions on law enforcement than is mandated by the Fourth Amendment." *Id.* at 32-33, citing *Nash, supra* at 213.[11]

---

[11] [In *Nash*], Justice BRICKLEY explained that when art 1, § 11 was under consideration by delegates to the 1961 convention, the focus of their concern was on the effect of the then recently decided case of *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), which required the states to apply the exclusionary rule to Fourth Amendment violations in all cases. Fearing that *Mapp* had invalidated the third sentence of Const

Second, we find no "compelling reasons" to hold that the Michigan Constitution provides a greater suppression remedy.[12] The Court of Appeals focused on three possible reasons why the Michigan and federal constitutions should be interpreted

---

1908, art 2, § 10, the Committee on Declaration of Rights, Suffrage, and Elections proposed at one point that the following language be substituted for that portion: " 'Evidence obtained in violation of this section shall not be used except as authorized by law.' " 418 Mich 211. Far from attempting to expand the protection of the state's constitutional provision, the committee preferred the substitute language because it would permit "the possibility of a less stringent application of the exclusionary rule if allowed by federal law . . . ."[31]

. . . Choosing to retain the third sentence aimed at the exclusionary rule, the convention made only stylistic improvements in the wording of art 1, § 11 before adopting and recommending it to the people.

---

[31] 418 Mich 212 (quoting Committee Proposals and Reports, Constitutional Convention 1961, Supporting Report, Committee Proposal No 15, pp 7, 10).

---

[*Collins, supra* at 27-28.]

The Court in *Collins* pointed to the following language from the Constitutional Convention of 1961:

"The time is now and the place is here to retain in our constitution in improved form the proviso which will protect the law-abiding citizen and the law enforcement officer.

"Should this proviso later be struck down by the courts as violative of the federal constitution the resulting license of the hoodlum, the burglar, the highwayman, the bank robber, and the narcotics peddler, will be chargeable to those courts and not to this convention." [*Id.* at 28, n 33, citing 1 Official Record, Constitutional Convention 1961, p 496. See also *People v Smith*, 420 Mich 1, 20; 360 NW2d 841 (1984), and *People v Catania*, 427 Mich 447; 398 NW2d 343 (1986), in which the Court did not find a meaningful distinction between the texts of the federal and state constitutions.]

[12] The dissent in the instant case ignores the fact that there is no compelling reason to interpret the state constitution differently than the federal constitution. By failing to show a compelling reason, the dissent successfully ignores this Court's holding in *Nash, supra*, where this Court stated that the Michigan Constitution does not provide a greater degree of protection than the federal constitution unless there is a "compelling reason" to do so. *Nash, supra* at 207-215 and 225-226.

differently: (1) the failure to apply the exclusionary rule in this case would frustrate the deterrent purpose of the rule, (2) the burden on the defendant to prove collusion between the agency that seized the evidence and the agency seeking to admit the evidence is too great, and (3) criminal cases could be used as a "mere" pretext to civil cases. 200 Mich App 550-552.

These concerns have been addressed in *Janis* and *Tirado, supra.* In *Janis,* the United States Supreme Court recognized that the judicially created exclusionary rule is to deter unlawful police conduct. " 'In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.' " *Id.* at 446, quoting *United States v Calandra,* 414 US 338, 348; 94 S Ct 613; 38 L Ed 2d 561 (1974). However, the Supreme Court held that the deterrent purpose does not extend to evidence subsequently used in civil cases because "[i]t falls outside the offending officer's zone of primary interest." *Janis* at 458. When the *Janis* rule was extended to intrasovereign situations, the *Tirado* court similarly held that the deterrent purpose of the exclusionary rule would not be furthered by barring illegally seized evidence from criminal cases.

We agree. Allowing the evidence in this case to be admitted into evidence for purposes of a civil tax proceeding would not hinder the deterrent effect of the exclusionary rule and would not increase the use of criminal cases as a "mere" pretext for civil cases. The civil tax proceeding in this case is wholly independent of any criminal prosecutions, and there is no evidence that the law enforcement agents who seized the incriminating financial records were motivated by an unethical

desire to illegally assist the Department of Treasury.

Because there is no evidence of bad faith, collusion between agencies, or unethical behavior on the part of the law enforcement agents, allowing the evidence to be admitted in the civil tax proceeding will affect neither the deterrence of the exclusionary rule nor allow an increase in the use of criminal cases as a mere pretext for civil cases. Evidence unlawfully secured by criminal law enforcement agents with the intent to unethically and illegally assist civil law enforcement authorities is not admissible.

We do not find the burden on defendants to show collusion between agencies too great. The burden on defendants is the same for federal and state defendants, thus there is no reason to interpret the federal and state laws differently. With some of the most liberal discovery rules present in Michigan, the burden on Michigan defendants actually seems less than the burden for federal defendants. See MCR 6.201.

Furthermore, unlike the contention of the Court of Appeals, *Lebel v Swincicki,* 354 Mich 427, 435-440; 93 NW2d 281 (1958) and *McNitt v Citco Drilling Co,* 397 Mich 384; 245 NW2d 18 (1976), do not support the defendant's arguments. Although these cases state that "Michigan's exclusionary rule [has in certain cases been applied] in civil proceedings," *Lebel* and *McNitt* involved removal of blood from a living person, a degree of intrusiveness not present when police armed with a warrant search one's home. We find these cases inapplicable to the instant case.

Similarly, under the *Wolf* balancing test, we reach the identical conclusion that the evidence seized in the present case was properly admitted in the civil tax proceeding. By balancing each of

the five *Wolf* factors, we conclude that an application of the exclusionary rule in the instant case would not deter future violations of the Fourth Amendment.

The first prong we must consider is the nature of the civil tax proceeding. The tax proceeding at issue is a jeopardy tax assessment initiated by the Department of Treasury for unpaid taxes on drug sales between July, 1988, and July, 1989, pursuant to MCL 205.26; MSA 7.657(26). Unlike the dissent, we do not view this proceeding as "quasi-criminal."

Although it is undeniable that the jeopardy statute at issue is used frequently to aid the taxing of criminal activity, the jeopardy tax statute is not quasi-criminal. Paying taxes is a task shared by all citizens of this state, criminals and noncriminals alike. The jeopardy tax statute simply aids in taxing those who "intend[ ] quickly to depart from the state or to remove property from this state, to conceal the person or the person's property in this state, or to do any other act tending to render wholly or partly ineffectual proceedings to collect the tax unless proceedings are brought without delay . . . ." MCL 205.26; MSA 7.657(26). Thus, unlike the dissent, we do not view the jeopardy tax proceedings as a "de facto punishment for individuals who are involved in inherently suspect criminal activities." CAVANAGH, J., *post* at 249. Rather, we view MCL 205.26; MSA 7.657(26) as an aid that allows the Department of Treasury to tax all citizens equally, even in the face of fear that some citizens will quickly remove property or depart from this state.

Moreover, we find it unnecessary to even define a jeopardy tax assessment as criminal or quasi-criminal. The exclusionary rule is designed to protect defendants from illegal searches and sei-

zures, and to deter police officers from violating a person's Fourth Amendment rights. In this case, the defendant already reaped the benefits of the exclusionary rule. She avoided a long prison sentence. If we were to extend the exclusionary to civil tax proceedings, we would not only allow this defendant to avoid a long prison sentence, but she would also be allowed to avoid paying the taxes that *every* citizen of this state must incur.

Second, the *Wolf* test requires that we determine whether the proceedings were intersovereign or intrasovereign. We find that the secondary proceedings were intrasovereign. It is undeniable that both the Western Wayne Narcotics team officers and the Department of Treasury are intrasovereign because both are agencies of this state. However, as in *Wolf,* although intrasovereign proceedings do weigh in favor of applying the exclusionary rule, "[t]his factor alone . . . is insufficient to suggest that there exists a close relationship between the purposes of the search and the secondary proceedings." *Id.* at 195.

Third, it is abundantly clear that the criminal and tax proceedings were instituted by different agencies. This most definitely weighs against applying the exclusionary rule in this case. Even the dissent acknowledges that the proceedings were instituted by different agencies, but skirts the issue by recognizing that Governor Engler transferred the Tax Fraud Division from the Department of Treasury. Executive Reorganization Order No. 1992-8, issued December 18, 1992, as Executive Order No. 1992-25 (effective March 15, 1993) (may also be found at MCL 28.701; MSA 21.314[5]). It is true that there is an Executive Reorganization Order that transferred the Tax Fraud Division from the Department of Treasury to the Department of State Police; however, because the

effective date of the order was not until March 15, 1993, it does not affect this case.

The last two prongs of the *Wolf* test require this Court to determine whether there was an "explicit and demonstrable understanding" between the two agencies involved in the case, and examine the relationship between the seizing officials and "zone of interest" of the seizing officials. The dissent argues that the record "reveal[s] curious facts" and argues that "this case reveal[s] a nexus that is simply too close for comfort . . . ." CAVANAGH, J., *post* at 259, 260. However, the dissent acknowledges that there is "no specific proof of cooperation or collusion" in this case. *Id.* at 258.

In the absence of more than "curious facts" and agreeing with the dissent that there is no direct evidence of bad faith, collusion between the agencies, or unethical behavior on the part of the law enforcement agents, we conclude that the Court of Appeals incorrectly found that evidence seized in an improper police search may not be used as the basis of an independent civil jeopardy tax assessment proceeding. Accordingly, we reverse the decision of the Court of Appeals and reinstate the order of the Tax Tribunal.

BRICKLEY, C.J., and BOYLE, RILEY, and WEAVER, JJ., concurred with MALLETT, J.

CAVANAGH, J. (*dissenting*). The issue in this case is whether the Fourth Amendment[1] exclusionary rule precludes the use of unconstitutionally seized evidence in a Michigan jeopardy tax assessment proceeding. The majority states that under the federal rule the illegally seized evidence may be used in this civil tax case. MALLETT, J., *ante* at

---

[1] US Const, Am IV.

224-225.[2] I disagree. I dissent because I believe that under the prevailing federal authority, the exclusionary rule clearly precludes use of the evidence in this jeopardy tax proceeding. This conclusion is based on the quasi-criminal nature of the tax fraud penalties and of the jeopardy assessment proceedings, on the factual connection between the police officers who illegally obtained the underlying evidence and the subsequent tax proceeding, and on the minimal cost to society of excluding the evidence in the *jeopardy* proceeding.

I

Courts have long struggled with the issue whether the exclusionary rule should be applied in civil proceedings when the unconstitutional search or seizure that produced the evidence at issue in the civil setting was obtained by individuals from an agency unconnected to the particular agency offering the evidence in the civil proceeding. With the primary rationale of the exclusionary rule being the deterrent of future violations of constitutional rights, the United States Supreme Court has answered the issue with a case-by-case balancing test of weighing the deterrent effect of suppressing the evidence against the costs to society of losing relevant evidence.

*United States v Janis,* 428 US 433, 459-460; 96 S Ct 3021; 49 L Ed 2d 1046 (1976), held:

[T]he judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a

[2] The majority also states that the appellee, Diane Kivela, does not contest this. *Ante* at 230. While the appellee did not file a brief in this Court, she did argue in her brief to the Court of Appeals that *Tirado v Comm'r of Internal Revenue,* 689 F2d 307 (CA 2, 1982), was wrongly decided.

criminal law enforcement agent of another sovereign.

However, the Supreme Court expressly warned that its holding was based on several assumptions. Significantly, the Court expressly left open the issue involving an intrasovereign violation. *Id.* at 455, n 31. Further, the Court stated that it was assuming that no arrangement or agreement existed between the agencies involved to use the evidence. *Id.* It left open the issue of a case where the agents who committed the unconstitutional search or seizure owed a "duty to, or [had] an agreement with, the sovereign seeking to use the evidence." *Id.* at 455.

Moreover, the Court expressly cautioned that it was not faced with a case that could be characterized as "quasi-criminal." *Id.* at 447, n 17. It placed forfeiture actions that are intended as a penalty for *criminal* activity in a different category. The Court has recently reaffirmed the axiom that the Fourth Amendment applies in civil proceedings and that the exclusionary rule applies in civil forfeitures. *United States v James Daniel Good Real Property,* 510 US 43, —; 114 S Ct 492; 126 L Ed 2d 490, 500-502 (1993); *Austin v United States,* 509 US 602, —, n 4; 113 S Ct 2801; 125 L Ed 2d 488, 496, n 4 (1993).[3]

---

[3] The United States Supreme Court declined to apply the exclusionary rule issue in one situation involving an intrasovereign violation in *Immigration & Naturalization Service v Lopez-Mendoza,* 468 US 1032; 104 S Ct 3479; 82 L Ed 2d 778 (1984). That case is distinguishable from the instant case because the Court determined that deportation proceedings are "purely civil action[s]." *Id.* at 1038. The Court also noted that the societal costs of excluding relevant evidence in deportation proceedings "would be very much greater" than the social costs in tax proceedings. *Id.* at 1042. Further, the Court noted that deportation of the alien could easily be achieved by independent means because the only necessary evidence in deportation is identity and alienage. *Id.* at 1043. Therefore, the Court found minimal deterrent effect. This is very different from tax proceedings where the tax

In this case, the majority states:

> It is undisputed that under federal authority, the financial records documenting the sales and purchases of narcotics seized from a defendant by one sovereign pursuant to an invalid search warrant, may be used as evidence in a civil tax assessment proceeding by another sovereign. [MALLETT, J., *ante* at 224-225, citing *Janis, supra.*]

In this simplistic interpretation of the *Janis* holding, the majority has ignored the assumptions that the United States Supreme Court made in order to reach the ultimate disposition of the case. In fact, *Tirado v Comm'r of Internal Revenue,* 689. F2d 307, 312 (CA 2, 1982), the primary case on which the majority relies, expressly recognized the factual underpinnings of *Janis:*

> Though the relationship between the search and the proceeding at which the evidence is presented provides a general indication of the likelihood of achieving marginal deterrence by applying the exclusionary rule, the specific facts of an investigation may reveal that an initial assumption about the officers' likely motivation was incorrect. In *Janis,* for example, the exclusionary rule probably would have been invoked if evidence had shown that, contrary to general expectations, the police had planned their search in conjunction with, or received encouragement beforehand from, the IRS, or that the police had realized during the search that the IRS would be interested in their discoveries and for that reason had gone out of their way to aid the IRS. Any indication of an explicit and demonstrable understanding between the two law enforcement bodies would be decisive. Such collusion might also be inferred from the officers' conduct, perhaps indicated by an incongruity between

assessment is derived exclusively from the illegally obtained evidence. As in criminal drug cases, once the evidence is excluded, the case usually cannot proceed. Therefore, the deterrent effect remains viable and meaningful.

the official objective of the search (as announced in the warrant, for example) and the items actually seized. Thus, if in *Janis* the evidence seized had been only tenuously relevant to the gambling investigation but obviously important to tax investigations, the Court might have had to revise its assessment that the investigators were not acting out of an interest in revenue violations. By contrast, the fact that in that case the evidence seized was directly related to the gambling investigation was consistent with the Court's expectation that the local police were not acting to aid the IRS.

The majority's blanket statement with respect to intersovereign proceedings is simply not supported by the law.

The majority further declares:

> In the intrasovereign context, we hold that in the absence of collusion, unlawfully seized evidence may properly be admitted for purposes of an independent civil tax assessment proceeding. [MALLETT, J., *ante* at 222.]

This statement was arguably the *Tirado* holding. However, I believe that *Wolf v Comm'r of Internal Revenue*, 13 F3d 189 (CA 6, 1993), persuasively established a workable framework for analyzing the issue before us. The *Wolf* court rejected the *Tirado* "collusion" test as outcome determinative. In contrast, *Wolf* properly interpreted *Janis* as requiring an analysis where the incremental deterrent effect[4] of applying the exclusionary rule in a civil proceeding is balanced against the substantial cost to society's interest in using relevant evidence. *Id.* at 193, citing *Janis, supra* at 448-449, 453-454. *Wolf* rejected *Tirado's* approach that focused predominately on the "primary zone of interest" of the officer who had conducted the

---

[4] *Janis* focused on the "incremental" effect because the primary deterrent effect is realized by punishing the seizing officer by excluding the evidence in criminal proceedings. *Janis, supra* at 448, 453-454.

search. *Id.* at 193, citing *Tirado, supra* at 312.[5]
*Wolf* envisioned that *Tirado's* approach would lead
to "bizarre results." *Id.* at 194.[6]

Instead, *Wolf* held that the primary focus should
be on the nature of the subsequent proceeding.[7]
The court noted that "[w]here civil proceedings are
brought, for example, to tax ill-gotten gains, such
proceedings do little more than subject criminals
to the same taxes that govern all citizens." *Id.*

*Wolf* summarized the considerations that a court
should examine in determining the extent of the

[5] *Wolf* criticized the *Tirado* court for minimizing the intrasovereign
factor, "notwithstanding the significance apparently attached to this
factor by the Supreme Court in *Janis* . . . ." *Id.* at 193, n 3, citing
*Janis, supra* at 457.

[6] The *Wolf* court reasoned:

In considering whether deterrent effects are likely, however,
we need not rely primarily on the existence of a correlation
between the officer's expertise and authority and the nature of
the subsequent proceedings. *On the contrary,* we believe that a
deterrent effect is determined by reference primarily to the
nature of the proceedings. To rely primarily on the existence of
a correlation between an officer's expertise and authority and
the subsequent proceedings, if taken to its logical conclusion,
would produce bizarre results. For example, the exclusionary
rule would not apply under such analysis where a criminal
narcotics investigation is followed by a criminal tax prosecution
so long as the seizing officer lacked expertise and authority
relating to the subsequent criminal tax prosecution. [*Id.* Em-
phasis added.]

[7] The court explained:

The primary interest of law enforcement agents is the appre-
hension, incapacitation, punishment, and (formerly, at least)
rehabilitation of criminals, as well as the possible deterrence of
future criminals, through the imposition of criminal sanctions.
It may matter little to the investigating agents that the offense
that is actually charged corresponds to their personal areas of
expertise and authority. An agent of the Bureau of Alcohol,
Tobacco, and Firearms, for example, may be sufficiently inter-
ested in the conviction of an Al Capone for criminal tax evasion
as in the conviction of an Al Capone for alcohol or firearms
violations. By contrast, such an agent may have little interest
in subsequent civil proceedings. [*Id.*]

incremental deterrent effect of the exclusionary
rule in civil proceedings. *Id.* at 194-195. In addition
to the primary consideration of the nature of the
subsequent proceeding, *Wolf* held that a court may
also consider whether the proposed use of evidence
is intersovereign or intrasovereign. Additionally, a
court may consider whether the same agency was
involved in both the search and the subsequent
proceeding. If the agencies were not the same,
then a court may consider whether there was
" '[a]ny indication of an explicit and demonstrable
understanding between the two law enforcement
bodies.' " *Id.* at 195, quoting *Tirado, supra* at 312.
In the absence of an explicit understanding, a
court may consider whether there is a statutory
scheme in which both agencies share common
resources. And finally, *Wolf* stated that a court
may consider the factor that *Tirado* emphasized,
that is, the closeness of the relationship between
the seizing officer's responsibilities and expertise
and the type of the subsequent proceeding in issue
—the seizing officer's zone of primary interest. *Id.*
The closer the relationship involved, the greater
the inference that the officer had the subsequent
proceeding in mind at the time of the seizure. *Id.*

## II

In the instant case, the criminal proceedings
were dismissed because the trial court determined
that the evidence underlying the charges was
unconstitutionally obtained by a warrant that
lacked probable cause. The primary deterrent ef-
fect has been achieved. Therefore, the issue we
must answer now is whether the incremental de-
terrent effect of excluding the evidence in a jeop-
ardy tax proceeding outweighs the substantial cost
to society of precluding relevant evidence. I believe

that *Wolf* correctly summarized the appropriate considerations that a court should examine, and I will now analyze those factors as presented in this case.

### A. NATURE OF THE PROCEEDING

I believe that the fraud penalty and jeopardy aspects of this proceeding characterize it as quasi-criminal. Here, the tax[8] at issue was a *jeopardy* tax assessment, issued pursuant to MCL 205.26; MSA 7.657(26).[9] Section 26 provides:

> If the commissioner . . . finds that a person liable for a tax administered under this act intends quickly to depart from the state or to remove property from this state, to conceal the person or the person's property in this state, or to do any other act tending to render wholly or partly ineffectual proceedings to collect the tax unless proceedings are brought without delay, the commissioner . . . shall give notice of the findings to the person, together with a demand for an immediate return and immediate payment of the tax. A warrant or warrant-notice of levy may issue immediately upon issuance of a jeopardy assessment. Thereupon, the tax shall become immediately due and payable. If the person is not in default in making a return or paying a tax prescribed by this act, and furnishes evidence satisfactory to the commissioner . . . under rules promulgated by the department that the return will be filed and the tax to which the commissioner's . . . finding relates will be paid, then the tax shall not be payable before the time otherwise fixed for payment.

---

[8] The appellee was billed $9,780 for sales tax, $48 for use tax, $1,595 for income tax, and $1,238 for single business tax, along with $12,661 as penalties for fraud, and $757 in interest.

[9] Before 1980 PA 162, jeopardy assessments were scattered among the separate statutory taxing schemes. 1980 PA 162 consolidated these assessments into § 26. House Legislative Analysis, HB 4718 (Second Analysis), July 22, 1980.

In *Janis, Tirado,* and *Wolf,* the tax assessment was imposed under normal tax provisions that were applicable to all citizens.[10] In sharp contrast, the *jeopardy* assessment is an extraordinary remedy[11] that is only available when "the collection of the tax is, in fact, in jeopardy." *Troy Industrial Catering Service, Inc v Treasury Dep't,* 105 Mich App 86, 90; 307 NW2d 345 (1981). By its very nature, "jeopardy" implies inherently suspect activity because the statute requires a finding that the individual's assets are about to disappear. I believe that the jeopardy assessment is best characterized as an additional penalty imposed for the

[10] By comparison, *Adamson v Comm'r of Internal Revenue,* 745 F2d 541 (CA 9, 1984), involved a jeopardy assessment, but the court upheld the assessment primarily because the subsequent use was *inter*sovereign. *Adamson* is factually distinguishable from the present case.

[11] This Court has previously examined the unique and drastic nature of a jeopardy assessment:

> Normally, it is only after notice to the taxpayer and an opportunity for a departmental hearing that deficiencies, interest and penalties may be collected. The jeopardy assessment procedure, however, permits simultaneous demand for taxes claimed owing and seizure of the taxpayer's property to satisfy this demand. While the language of the jeopardy provisions of the Use Tax Act and the Income Tax Act vary slightly, the procedures are essentially the same. Treasury may make a finding that collection of taxes is in jeopardy due to some act of the taxpayer. The taxpayer is given notice of this finding and a demand for payment is made either personally or by certified mail addressed to the last known address of the taxpayer. Simultaneous with the mailing of notice and demand, a warrant may immediately issue for seizure of the taxpayer's property. The statutes do not provide for any prompt post-seizure hearing to determine whether the assessment for taxes owing has any basis in fact. There is no provision for taxpayer challenge of the departmental finding that an act tending to jeopardize collection has been or is about to be committed. Yet, it is this determination of jeopardy which sets into motion the extraordinary procedure permitting simultaneous demand and seizure. The potential for abuse or for injury due to mistake is obvious. [*Craig v Detroit Police Dep't,* 397 Mich 185, 189-190; 243 NW2d 236 (1976).]

specific purpose of punishing criminal-like activity.
In fact, the revenue division statute expressly
provides *criminal* felony penalties for individuals
who intentionally evade paying taxes. MCL 205.27;
MSA 7.657(27).[12] As such, the jeopardy assessment
is aimed *only* at individuals who are violating the
law by intending to evade tax collection, and
which, if successful, will subject them to felony
charges. In addition, one would intuitively pre-
sume that the type of individual that the jeopardy
statute is aimed at will be closely connected to
situations in which the basis of the underlying tax,
i.e., the particular business activity or the assets
involved, is criminal in nature. During oral argu-
ment, I asked the Assistant Attorney General who
argued this case whether the state is automati-
cally entitled to assess a jeopardy assessment in
every case simply because these individuals are
going to flee. He replied that the very nature of
drug dealing makes tax collection difficult because
individuals and assets can easily disappear. He
referred to the disposable nature of the assets
involved, the likelihood that such individuals may
flee, and that such individuals may in fact be
incarcerated.

Indeed, my nonexhaustive search through Michi-
gan appellate cases[13] and Michigan Tax Tribunal

---

[12] Section 27(2) provides:

> A person who violates a provision of this section with intent
> to defraud or to evade or assist in defrauding or evading the
> payment of a tax, or a part of a tax, is guilty of a felony,
> punishable by a fine of not more than $5,000.00, or imprison-
> ment for not more than 5 years, or both.

[13] *Hawkins v State Treasurer,* 200 Mich App 453; 505 NW2d 10
(1993) (narcotics); *Treasury Dep't v Campbell,* 161 Mich App 526, 528;
411 NW2d 722 (1986) (illegal drugs); *Greer v Treasury Dep't,* 145
Mich App 248, 249; 377 NW2d 836 (1985) (marijuana); *McFadden v
Downriver Area Narcotics Organization,* 90 Mich App 748, 749; 282

cases[14] confirms that a jeopardy assessment is imposed nearly exclusively when *criminal* activity is the basis of the assessment. In other words, jeopardy assessments are really a de facto punishment for individuals who are involved in inherently suspect criminal activities. See *Grosso v United States,* 390 US 62, 64; 88 S Ct 709; 19 L Ed 2d 906 (1968); *Marchetti v United States,* 390 US 39, 47; 88 S Ct 697; 19 L Ed 2d 889 (1968). As the United States Supreme Court declared in *Grosso,* even though the tax revenue collecting interest of the government is significant, "we cannot ignore . . .

NW2d 464 (1979) (criminal); *Treasury Dep't v Recorder's Court Judge,* 89 Mich App 650, 652; 281 NW2d 134 (1979) (controlled substances); *People v 3474 Fairview,* 81 Mich App 479, 480; 265 NW2d 381 (1978) (narcotics); *Sears v Treasury Dep't,* 57 Mich App 218, 219; 226 NW2d 63 (1974) (controlled substances). Cf. *Craig,* n 11 *supra* at 194-195 (remanded to determine if jeopardy had a basis in fact); *Troy Industrial Catering, supra* at 93 (remanded for hearing whether jeopardy was supported by facts); *Fidlin v Collison,* 9 Mich App 157, 166-167; 156 NW2d 53 (1967) (jeopardy seizure held unconstitutional because government agency failed to follow statutory procedure and because amount of property seized was excessive).

[14] *Martin v Treasury Dep't,* 8 MTTR 66, 68 (Docket No. 118169, September 27, 1991) (illegal narcotics activities); *Schubert v Treasury Dep't,* 7 MTTR 699, 701 (Docket Nos. 120461, 120462, June 2, 1992) (illegal gambling); *Wheeler v Treasury Dep't,* 7 MTTR 136, 145 (Docket No. 120029, April 10, 1991) (criminal charges of computer fraud); *Kozlowski v Treasury Dep't,* 7 MTTR 69, 70 (Docket No. 139007, September 6, 1991) (narcotics); *Burd v Treasury Dep't,* 7 MTTR 38, 40 (Docket No. 120047, April 23, 1991) (controlled substances); *Bolton v Treasury Dep't,* 7 MTTR 34, 35 (Docket No. 127719, October 7, 1991) (controlled substances); *McKenney v Treasury Dep't,* 6 MTTR 646, 648 (Docket No. 130072, November 30, 1990) (controlled substances); *Davis v Treasury Dep't,* 6 MTTR 578, 579 (Docket No. 133654, January 31, 1991) (cocaine); *Garcia v Treasury Dep't,* 6 MTTR 466, 468 (Docket No. 120484, June 12, 1990) (illegal drug trafficking); *Boyd & Gorman v Treasury Dep't,* 3 MTTR 603, 609 (Docket No. 90951, July 8, 1985) (jeopardy warrant executed with parallel criminal investigation); *Addabbo v Treasury Dep't,* 3 MTTR 572, 576 (Docket Nos. 75456, 75484, 75485, July 3, 1985) (criminal contraband cigarettes); *English v Treasury Dep't,* 3 MTTR 249, 250-251 (Docket No. 73585, May 11, 1984) (narcotics); *Myers v Treasury Dep't,* 1991 WL 420050 (MTTR) (Docket No. 142750, May 13, 1991) (narcotics); *Flanigan v Treasury Dep't,* 1990 WL 443938 (MTTR) (Docket No. 120463, January 17, 1990) (narcotics). Cf. *Parker v Treasury Dep't,* 4 MTTR 502 (Docket No. 94477, October 27, 1986) (failure to pay income taxes).

the characteristics of the activities" that the jeopardy assessment statute is aimed at. *Id.* at 68.

The United States Supreme Court's analysis in *One 1958 Plymouth Sedan v Pennsylvania,* 380 US 693; 85 S Ct 1246; 14 L Ed 2d 170 (1965), is dispositive. There, the issue was whether the exclusionary rule applied to forfeiture actions.[15] In holding that the exclusionary rule does apply, the Court emphasized the quasi-criminal nature of those proceedings:

> [A] forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law. . . . If convicted of any one of the possible offenses involved, [McGonigle] would be subject, if a first offender, to a minimum penalty of a $100 fine and a maximum penalty of a $500 fine. In this forfeiture proceeding he was subject to the loss of his automobile, which at the time involved had an estimated value of approximately $1,000, a higher amount than the maximum fine in the criminal proceeding. It would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible. *That the forfeiture is clearly a penalty for the criminal offense and can result in even greater punishment than the criminal prosecution* has in fact been recognized by the Pennsylvania courts. [*Id.* at 700-701. Emphasis added.]

Here, the criminal punishment for tax fraud is a penalty up to $5,000 or a felony term of imprison-

---

[15] The forfeiture action was based on criminal liquor activities.

ment up to five years, or both. § 27(2). In contrast, the civil tax fraud penalty is one hundred percent of the tax assessment, which, in this case was $12,661. MCL 205.23(5); MSA 7.657(23)(5). Clearly, the Supreme Court's analysis leads to the conclusion that tax fraud civil penalties and jeopardy assessments are quasi-criminal in character because their sole object is to punish an individual for evading the tax laws.

As such, I find persuasive the analysis used in *Vara v Sharp*, 880 SW2d 844 (Tex App, 1994). As in the instant case, criminal charges and drug forfeiture proceedings against Vara were dismissed because the underlying evidence was unconstitutionally obtained. *Id.* at 846. The issue was whether the evidence should be excluded in a civil tax case where the tax was imposed pursuant to controlled substance tax provisions. The court emphasized that the tax was only assessed against "individuals who are violating the law." *Id.* at 847. The court reviewed *Janis* and applied the *Wolf* factors, adding an additional factor of the nature of the search that led to the suppression of the evidence in the criminal proceedings. *Id.* at 850. The court concluded that even though the proceeding was a civil proceeding on its face, in reality it was quasi-criminal. As such, the court stressed the additional constitutional safeguards that the United States Supreme Court has repeatedly applied to quasi-criminal proceedings, relying on *One 1958 Plymouth Sedan, supra; Austin, supra; Dep't of Revenue v Kurth Ranch,* 511 US —; 114 S Ct 1937; 128 L Ed 2d 767 (1994). The *Vara* court held that even though a different state agency was involved, and even though there was no evidence in the record that the agencies involved actually exercised any explicit understanding to cooperate,

the exclusionary rule applied to suppress the evidence.[16]

A federal case with facts substantially similar to the instant case is *Estate of Merchant v Comm'r of Internal Revenue,* 947 F2d 1390 (CA 9, 1991). There, the IRS assessed a fraud tax penalty and a jeopardy assessment against the estate. The taxes were based on evidence that was obtained in an unconstitutional search by state police officers. The criminal charges were dismissed.[17] Subsequently, the federal district court also suppressed the illegally obtained evidence in the jeopardy tax proceeding and abated the jeopardy assessment, ordering the government to refund the money that had been seized, even though the subsequent use was intersovereign. *Id.* at 1392. Later, the IRS conceded the case with respect to the nonjeopardy assessments as well. Eventually, the parties stipulated that no taxes were due. The United States Court of Appeals for the Ninth Circuit noted that under the federal law, a jeopardy assessment proceeding is a "summary proceeding whose sole purpose is to determine the reasonableness of the jeopardy assessment." *Id.* at 1394. The court stressed that jeopardy assessments are substantively different from the underlying normal tax assessments. *Id.*

Likewise, even though the United States Supreme Court in *Kurth Ranch,* supra, addressed the issue of double jeopardy regarding a state dangerous drug tax,[18] the Court's analysis of tax laws should control in this case. The Court stated:

---

[16] See also *Pike v Gallagher,* 829 F Supp 1254, 1265 (D NM, 1993) (the exclusionary rule applies if the proceeding is quasi-criminal and the costs to society are outweighed by its deterrent effect).

[17] *United States v Merchant,* 760 F2d 963 (CA 9, 1985). Certiorari was originally granted by the United States Supreme Court, but was later dismissed as improvidently granted. 480 US 615; 107 S Ct 1596; 94 L Ed 2d 614 (1987).

[18] Double jeopardy is not at issue in this case because the criminal charges were dismissed.

Criminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals, and deter certain behavior. All of these sanctions are subject to constitutional constraints. A government may not impose criminal fines without first establishing guilt by proof beyond a reasonable doubt. . . . A defendant convicted and punished for an offense may not have a nonremedial civil penalty imposed against him for the same offense in a separate proceeding. [*United States v*] *Halper* [490 US 435; 109 S Ct 1892; 104 L Ed 2d 487 (1989)]. A civil forfeiture may violate the Eighth Amendment's proscription against excessive fines. *Austin* [*supra*] . . . . And a statute imposing a tax on unlawful conduct may be invalid because its reporting requirements compel taxpayers to incriminate themselves. *Marchetti* [*supra*]. [*Kurth Ranch,* 128 L Ed 2d 778. Citation omitted.]

The Court expressly stated that ordinary taxes are distinguishable from fines, penalties, and forfeitures, "because they are usually motivated by revenue-raising rather than punitive purposes." *Id.* at 779. And, ordinarily, taxes that are generally applicable may be assessed against illegal activity. *Id.* at 778. However, the Court specifically expounded that "at some point, an exaction labeled as a tax approaches punishment." *Id.* at 779. Moreover, the particular label that is attached to the assessment is not controlling. *Id.* at 777.[19] Turning to the specific tax at issue, the Court stated:

---

[19] The Court explained that whether the Double Jeopardy Clause applies is not determined by whether the proceedings are labeled criminal, but rather, it is determined

"only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state." [*Halper, supra* at 447.] In making such an assessment, "the labels 'criminal' and 'civil' are not of paramount importance." [*Kurth Ranch, supra* at 777.]

Taxes imposed upon illegal activities are fundamentally different from taxes with a pure revenue-raising purpose that are imposed *despite* their adverse effect on the taxed activity. But they differ as well from mixed-motive taxes that governments impose both to deter a disfavored activity and to raise money. By imposing cigarette taxes, for example, a government wants to discourage smoking. But because the product's benefits—such as creating employment, satisfying consumer demand, and providing tax revenues—are regarded as outweighing the harm, that government will allow the manufacture, sale, and use of cigarettes as long as the manufacturers, sellers, and smokers pay high taxes that reduce consumption and increase government revenue. *These justifications vanish when the taxed activity is completely forbidden,* for the legitimate revenue-raising purpose that might support such a tax could be equally well served by increasing the fine imposed upon conviction. [*Id.* at 780. Emphasis added.]

In the instant case, the "labels" attached to the underlying assessment were civil in nature: sales tax, use tax, income tax, and single business tax. And, the state may certainly assess general taxes against illegal activity. *Marchetti, supra* at 58. Further, the Department of Treasury also assessed a one-hundred percent fraud penalty on top of the general taxes. Again, permissible. However, fraud penalties are directed exclusively to the felonious activity of fraudulently evading the payment of taxes. § 27(2).[20] Moreover, *jeopardy* assessments are directed exclusively to the attempted or completed activity of intentionally evading taxes by leaving the state or concealing assets, which is a felony. Therefore, tax fraud penalties and jeopardy assessments are more analogous to civil forfeiture actions directed at criminal activity. In *United*

[20] See also § 23(5) (tax fraud civil penalty).

*States v Fifty-three Thousand Eighty-two Dollars
in United States Currency,* 985 F2d 245, 250 (CA 6,
1993), the court reiterated the rule that the quasi-
criminal nature of civil forfeiture proceedings re-
quires application of the exclusionary rule.

Consequently, it is the quasi-criminal nature of
the tax penalties at issue that likewise require
application of the exclusionary rule. Simply label-
ing the proceeding civil does not remove the crimi-
nal characteristics of the assessment.[21] Moreover,
simply failing to expressly label the jeopardy as-
sessment a criminal provision, does not remove its
quasi-criminal nature, which is borne out by the
de facto use of jeopardy assessments almost exclu-
sively in coordination with criminal proceedings.

Therefore, I conclude that the criminal nature of
jeopardy assessments and of tax fraud penalties
weigh heavily in favor of applying the exclusion-
ary rule.

The majority "cleverly fails to recognize" that
*Tirado* and *Wolf* did not involve tax fraud penal-
ties or jeopardy assessments. See MALLETT, J., *ante*
at 227, n 6. It can cite *no* case that involves either
a tax fraud penalty or a jeopardy assessment in
which a court, any court, has held that the exclu-
sionary rule does not apply. The majority states:

> Although it is undeniable that the jeopardy
> statute at issue is used frequently to aid the taxing
> of criminal activity, the jeopardy tax statute is not
> quasi-criminal. Paying taxes is a task shared by all
> citizens of this state, criminals and noncriminals
> alike. [*Id.* at 237.]

The majority fails to realize that tax fraud penal-

---

[21] *Sims v Collection Div of Utah State Tax Comm,* 841 P2d 6, 14
(Utah, 1992) (labels are irrelevant; the quasi-criminal nature of the
tax calls for application of the exclusionary rule).

ties and jeopardy assessments are *not* taxes that
are "shared by all citizens of this state . . . ." *Id.*

Moreover, the majority inexplicably states: "we
find it unnecessary to even define a jeopardy tax
assessment as criminal or quasi-criminal." *Id.* Yet,
the majority in its alternative *Wolf* analysis cor-
rectly states that the first prong of the test is the
nature of the subsequent proceeding. The majority
justifies its holding by stating that applying the
exclusionary rule here would allow the petitioner
"to avoid paying the taxes that *every* citizen of
this state must incur." *Id.* at 238. This statement
has ignored the types of taxes that were assessed
in this case. It is true that every citizen is subject
to sales, use, income, and single business taxes.
However, tax fraud penalties are assessed *only*
against criminally fraudulent conduct. And even
the majority admits that jeopardy assessments are
used against individuals who intend to avoid taxes
—which is a felony. See § 27. The majority's find-
ing that jeopardy assessments are not quasi-crimi-
nal is belied by the statute itself.

The majority has not attempted to distinguish
*Kurth Ranch,* which held that taxes aimed solely
at forbidden activity are in reality punishment, *id.,*
128 L Ed 2d 779-780, which for our purposes are
designated by the Michigan statute as fraud and
felonious evasion of taxes. *Kurth Ranch* declared
that taxes that are in reality punishment invoke
criminal constitutional protections. *One 1958
Plymouth Sedan* held that the exclusionary rule
applies. Yet, the majority has failed to engage in
any analysis to rebut the United States Supreme
Court's holdings.

### B. PROPOSED USE: INTERSOVEREIGN OR INTRASOVEREIGN

Here the evidence was illegally seized by West-

ern Wayne Narcotics team officers. The evidence is now being offered by the Michigan Department of Treasury. Because both agencies are statutorily derived from the Michigan Constitution,[22] the proposed use is intrasovereign, which weighs in favor of applying the exclusionary rule.

### C. PROCEEDINGS BROUGHT BY THE SAME OR DIFFERENT AGENCY

Here, under the then-existing structure of the state government, the criminal and tax proceedings were instituted by different agencies of the state, a factor arguably weighing against applying the exclusionary rule. However, it is imperative to recognize that Governor Engler has transferred the Tax Fraud Division from the Department of Treasury to the Department of State Police. Executive Reorganization Order No. 1992-8, issued December 18, 1992, as Executive Order No. 1992-25 (effective March 15, 1993) (may also be found at MCL 28.701; MSA 21.314[5]). For proceedings instituted on or after March 15, 1993, we will not even need to enter into this balancing test because the agencies involved will be one and the same.[23]

In this case, the Tax Fraud Division instituted the jeopardy assessment proceedings. If this case had been instituted after the order became effective, the exclusionary rule would irrefutably preclude use of the evidence illegally obtained.

### D. "EXPLICIT AND DEMONSTRABLE UNDERSTANDING" BETWEEN THE TWO AGENCIES/"ZONE OF INTEREST" OF SEIZING OFFICERS

I believe that these two factors are so closely

[22] Const 1963, art 5, §§ 2, 3 (state treasury department); Const 1963, art 7, § 4 (county sheriff).

[23] The Department of State Police is statutorily intertwined with all police agencies throughout the state. See MCL 28.1 *et seq.*; MSA 4.431 *et seq.*

related in the instant case that I will address them together. As I will explain below, I find that the facts in the instant record reveal a troubling nexus between the officers who seized the evidence and the Tax Fraud/State Police detective who initiated the tax proceeding. This nexus weighs in favor of applying the exclusionary rule.

Here, the majority finds "no evidence of bad faith, collusion between agencies, or unethical behavior on the part of the law enforcement agents . . . ." MALLETT, J., ante at 236. The majority is ignoring the obvious. Since the times of Al Capone, law enforcement efforts have involved multiagency cooperative efforts. Even though there may be no bad faith on the part of the officers involved, there certainly may be a cooperative attitude among the various agencies. Common sense tells us that there must be a working and on-going cooperation between the agencies or else cases like this would not be instituted.[24]

The appellee alleged in her brief to the Court of Appeals:

> There is considerable proof that at least in Michigan, there is a coordinated effort between criminal prosecutions, civil forfeiture actions and tax assessments such as the instant one. The officer who seizes drugs and money has indeed contemplated the subsequent aspect of civil penalties that are part of the all out "war against drugs."

Even though no specific proof of cooperation or collusion was produced in this case, the record

---

[24] *Wolf* also directs us to consider whether there is a statutory scheme in which both agencies share common resources. Such a scheme does, to some degree, exist in Michigan. For instance, by statute, all police agencies must submit reports to the state police department as part of the Uniform Crime Reporting System. MCL 28.251 *et seq.*; MSA 4.469(51) *et seq.*

does reveal curious facts. For instance, the illegal search occurred on July 7, 1989, by officers assigned to the Western Wayne Narcotics Team. Officer Robert Manes, after being duly sworn, stated in his affidavit:

> 1. I am a Detective Sergeant employed by the Michigan State Police and *assigned to the Tax Fraud Division of the Michigan Department of Treasury.*
> 2. That I make the within Affidavit based upon personal knowledge.
> 3. That in the course of my assignment, *I was contacted by* law enforcement officers assigned to the Western Wayne Narcotics Team and advised of the arrest of Dianne [sic] Lee Kivela. Said contact occurring on or about *September 18, 1989.*
> 4. That *I was further advised* that Kivela had been charged with the sale of marijuana *and was requested* to check to determine whether or not she had paid any taxes as a result of said sales.
> 5. That I checked the records of the Department of Treasury . . . .
> 6. That as a result of this check, I further determined that the said Dianne Lee Kivela had never registered with the Department of Treasury for sales, use or withholding tax.
> 7. That I obtained certain ledgers *from the Western Wayne Narcotics Team* which were seized during the execution of the search warrant on July 7, 1989 . . . . [Emphasis added.]

The criminal charges were dismissed on September 27, 1989.

When constitutional rights are at issue, we should not be blind to reality. Here, it was the Western Wayne Narcotics Team that contacted the Tax Fraud Division, in particular, a detective of the Michigan State Police who was assigned on a regular basis to the Department of Treasury. The

Department of Treasury did not need to track this case down, because the officers who did the actual illegal search came to the Department of Treasury. As Governor Engler has now merely made official, the Tax Fraud Division apparently was in reality closely connected to the Department of State Police. Moreover, the Tax Fraud Division, as initially represented by Michigan State Police Detective Manes, was on the case within two and one-half months—a full week and one-half *before* the criminal charges were dismissed because of the unconstitutional search warrant. If this does not show that the Western Wayne Narcotics Team members had tax consequences in mind at the time that they were pursuing the criminal prosecution, I do not know what would. Moreover, this was not an isolated incident of the police officers who conducted the search and seizure contacting the Department of Treasury.[25] For example, in *Garcia v Treasury Dep't,* 6 MTTR 466, 468 (Docket No. 120484, June 12, 1990), a department auditor indicated that it is *common procedure* for the police to contact the department in order "to inquire as to the department's possible interest in 'doing a tax case' so as to back up the forfeiture [action]."

The facts in this case reveal a nexus that is simply too close for comfort when constitutional rights are at stake.[26] I would weigh the zone of primary interest factor in this case in favor of

[25] Most of the cases involving jeopardy assessments do not indicate who contacted whom; however, some of the cases did expressly state that it was the police who contacted the Department of Treasury. For example, see *Schubert,* n 14 *supra* at 703 (the state police contacted the department); *Boyd & Gorman,* n 14 *supra* at 608 (a state police officer determined that Department of Treasury might be interested in the criminal activities and contacted the department).

[26] Where multiple agencies are working together, the exclusionary rule fully applies. *Vander Linden v United States,* 502 F Supp 693, 697 (SD Iowa, 1980). The deterrent effect is given more weight when the same agencies are involved and they are working closely together and sharing information.

applying the exclusionary rule. Admittedly, the explicit and demonstrable understanding factor is too ambiguous on these facts to clearly weigh in either direction.

### III

I would hold that under the federal authority, the balancing test factors clearly weigh more heavily in favor of applying the exclusionary rule. I am most persuaded by the criminal nature of jeopardy assessments and fraud penalties, and by the actual connection between the seizing officers and the Tax Fraud/State Police detective and the division of the Department of Treasury. The incremental deterrent effect is substantial and undeniably outweighs the slight societal cost of delaying tax assessment proceedings until the case can proceed through the ordinary tax collection procedures. There would be no cost to society of the ultimate collection of the revenue from the ordinary taxes from sales, use, income, and single business assessments because such taxes may be appropriately pursued through the normal civil tax proceedings that govern all citizens. See *Wolf, supra* at 194. The only cost would be the loss of the fraud penalty assessments and of the *timing* of the collection because of the accelerated jeopardy collection mechanism. These costs are slight because the primary source of revenue has not been impeded.

However, in cases that arose after the effective date of Governor Engler's reorganization order, no balancing test will be required because the seizing officers and the tax agents are now members of the same agency. The deterrent effect would no longer be incremental; it would be primary because the very agency violating the individual's constitutional rights would be punished by precluding the use of the evidence in civil tax proceedings as well as suppressing the evidence in criminal proceed-

ings.[27] All would not be lost to society, because the government would be allowed to attempt to secure independent nontainted evidence to support applicable tax assessments.[28]

Therefore, I would affirm the result of the Court of Appeals decision.

LEVIN, J., concurred with CAVANAGH, J.

[27] The rationale for the exclusionary rule in such a situation has long been explained as follows:

"The prohibition[ ] against unreasonable searches and sei- . zures is directed at governmental action. Absent an exclusionary rule, the Government would be free to undertake unreasonable searches and seizures in all civil cases without the possibility of unfavorable consequences. In such a situation, while the matter has not been settled by Supreme Court decision, it seems clear, even under a view of the law most favorable to the Government, that evidence so obtained would be excluded." [*United States v Modes, Inc,* 787 F Supp 1466, 1470 (CIT, 1992), quoting *Pizzarello v United States,* 408 F2d 579, 586 (CA 2, 1969).]

In *Modes,* the court held that the exclusionary rule fully applies to civil proceedings where the objective is to impose the equivalent of a penalty. *Id.* at 1471. It further held that the exclusionary rule should be applied against customs agents in a civil import penalty proceeding, which was quasi-criminal in nature. However, the court found the evidence was admissible under the independent source doctrine.

[28] See *Vander Linden,* n 26 *supra* at 698.